William CAULFIELD et al., Plaintiffs,

Albert Shanker et al.,
Intervenors-Plaintiffs,

Theodore Elsberg et al.,
Intervenors-Plaintiffs,

v.

The BOARD OF EDUCATION OF the
CITY OF NEW YORK et al.,
Defendants,

The Coalition of Concerned Black Educators et al., Intervenors-Defendants,

Ronald Ross, Intervenor-Defendant.

No. 77 C 2155 (JBW).

United States District Court,
E. D. New York.

Aug. 27, 1979.

---

See also, 2 Cir., 583 F.2d 605.

Morris Weissberg, New York City, for plaintiffs.

Gretchen White Oberman, Lewis, Greenwald & Oberman, New York City, for intervenors-plaintiffs Elsberg, et al.

James R. Sandner, New York City by Jeffrey S. Karp, New York City, of counsel, for intervenors-plaintiffs Albert Shanker, et al.

Allen G. Schwartz, Corp. Counsel of the City of New York, New York City by Deborah Rothman, Jane Hovde, Asst. Corp. Counsel, New York City, for defendant New York City Board of Education.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. by Richard P. Caro, Asst. U. S. Atty., Brooklyn, N. Y., Lois Hochhauser, Albany, N. Y., for Department of Health, Education and Welfare.

James I. Meyerson, N.A.A.C.P., New York City, for intervenors-defendants Coalition of Concerned Black Educators, et al.

Arthur N. Eisenberg, New York Civil Liberties Union, E. Richard Larson, Bruce J. Ennis, American Civil Liberties Union, Jeanne R. Sielver, Public Education Ass'n, Carolyn L. Ziegler, New York City, for intervenor-defendant Ross.

Kenneth Pawson, New York State Dept. of Ed., Albany, N. Y., for State Commissioner of Education Gordon Ambach.

## MEMORANDUM

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I. Background of the Litigation 867
   A. Events Leading to the Memorandum of Understanding 867
   B. The Related ESAA Funding Controversy 869
   C. Prior Litigation in This Case 871
   D. Litigation Regarding ESAA Fund Ineligibility 872

II. Parties, Issues and Standard of Review in this Litigation 875

III. Preliminary Issues 878
   A. Standing 878
   B. Jurisdiction 878
      1. Title VI of the Civil Rights Act 878
      2. Title IX of the Education Amendments 882

IV. Evidence     885

  A. Background     886

    1. Statutory Framework     886

      a. Prior to Decentralization     886

      b. Following Decentralization     886

    2. Historical Backdrop of Criticism     887

    3. Board Procedures for Assigning Teachers     893

      a. Prior to Decentralization     894

        1. Elementary Schools     894

        2. Junior High and High Schools     895

      b. During Interim Period     895

      c. Following Decentralization     895

        1. Elementary and Junior High Schools     895

        2. High Schools     897

      d. The Problem of Assignment Declination Following the Budget Crisis     897

    4. Demographic Changes in Student Population     897

  B. OCR's Charges and Evidence     898

    1. Racially discriminatory selection and testing procedures and racially identifiable employment pools     898

      a. racially identifiable employment pools     898

      b. racially discriminatory selection and testing procedures     901

        1. "pass-fail score"     902

        2. "numerical score above passing"—rank order     903

        3. "date of examination"     906

    2. Assignment of teachers in a manner that has created, confirmed and reinforced the racial or ethnic identifiability of the system's schools     908

    3. Assignment of teachers with less experience, lower average salaries and fewer advanced degrees to schools with higher percentages of minority students     913

    4. Denial to women of equal access to positions as principals and assistant principals throughout the system     916

  C. Rebuttal Evidence     919

V. Summary and Conclusions     923

---

This is yet another chapter in the challenge to the September 7, 1977 "Memorandum of Understanding" ("agreement") between the New York City Board of Education ("Board") and the Office for Civil Rights of the United States Department of Health, Education and Welfare ("OCR"). The agreement purports to remedy alleged violations by the Board of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, with respect to hiring and assignment of teachers, and hiring of supervisory personnel. Alleging that OCR had no jurisdiction to investigate what they deem "employment" practices under either Title VI, *see* 42 U.S.C. § 2000d–3, or Title IX, and that the agreement itself violates Title VI, Title IX, and the fifth and fourteenth amendments, plaintiffs and intervenor-plaintiffs seek injunctive and declaratory relief voiding the agreement. For the reasons indicated below, no relief is warranted.

Following a bench trial, this Court delivered an oral opinion and filed written findings of fact and conclusions of law. This Memorandum elaborating on the Court's oral opinion may be of assistance on the appeals.

## I.

*Background of this Litigation*

### A. Events Leading to the Memorandum of Understanding

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title IX of the Education Amendments of 1972, in similar language, prohibits discrimination on the basis of sex in "any education program or activity" receiving federal funds. Each federal department and agency is charged with assuring compliance with these provisions in the programs and activities under its jurisdiction; each must adopt regulations toward this end. *See* 42 U.S.C. § 2000d–1; 20 U.S.C. § 1682. *See, e. g.*, 45 C.F.R. §§ 80.1–80.13 (Title VI regulations of Department of Health, Education and Welfare); 45 C.F.R. §§ 86.1–86.71 (Title IX regulations of Department of Health, Education and Welfare). In addition to requiring initial assurances of nondiscrimination in every application for federal assistance, *see, e. g.*, 45 C.F.R. § 80.4, federal departments are required to conduct periodic compliance reviews and to investigate and resolve individual or class complaints of discrimination arising under any federally assisted program they supervise. *See, e. g.*, 45 C.F.R. § 80.7; *see also Brown v. Weinberger*, 417 F.Supp. 1215 (D.D.C.1976) (requiring expeditious compliance investigations and enforcement proceedings by HEW under Title VI). In the event that efforts to achieve voluntary compliance fail, a federal department must terminate or withhold federal funding to programs in violation of the statutes, *see* 42 U.S.C. § 2000d–1(1), or seek compliance by other means authorized by law, *see id.* § 2000d–1(2).

The Department of Health, Education and Welfare supervises various programs of federal aid to the New York City school system. On November 9, 1976, OCR Director Martin Gerry sent a letter to the Chancellor of the New York City Schools specifying alleged areas of noncompliance by the school system with Titles VI and IX. The letter focused on the "employment" phase of OCR's review of the system. It charged that the Board had, in violation of Title VI, discriminated on the basis of race and national origin by,

(1) den[ying] minority teachers full access to employment opportunity through the use of racially discriminatory selection and testing procedures and through the use of racially identifiable employment pools in a manner that discriminatorily restricts the placement of minority teachers;

(2) assign[ing] teachers, assistant principals and principals in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools; and

(3) assign[ing] teachers with less experience, lower average salaries and fewer advanced degrees to schools which have higher percentages of minority students.

It also charged that the Board had, in violation of Title IX, discriminated on the basis of sex by,

(1) deny[ing] females equal access to positions as principals and assistant principals throughout the system;

(2) provid[ing] a lower level of financial support for female athletic coaching programs; and

(3) depriv[ing] female teachers of seniority rights and other compensation through failure to eliminate the effects of past discriminatory leave policies.

The letter ordered the Board to submit a plan within ninety days to "remedy the discrimination and provide corrective action where individual cases of discrimination are identified." It noted that OCR's goal was "to end discrimination not to cut off federal funds."

After receipt of the November 9, 1976 letter, the Chancellor appointed Deputy Chancellor Bernard Gifford to serve as chairperson of an internal Board committee to review and evaluate OCR's specific dis-

crimination allegations. The result of this review, a report entitled Race, Ethnicity and Equal Employment Opportunity: An Investigation of Access to and Assignment of Professional Personnel in New York City's Public Schools (June 1977) ("Gifford Report") (Def.-Int. Ross' Ex. 106), substantiated and confirmed many of OCR's findings, though it denied any discriminatory intent on the part of the Board. *See Caulfield v. Board of Education of the City of New York,* 583 F.2d 605, 609 & n. 5 (2d Cir. 1978). On April 22, 1977, the Board submitted its response to the OCR allegations; it suggested affirmative efforts to equalize employment opportunities:

> [w]ithout admitting any violation of law, [the response] expressed [the Board's] determination to rectify "disparate employment opportunities" and proposed an equal employment opportunity plan to "insure equality of opportunity and avoidance of discrimination." [The plan] suggested affirmative efforts to increase the number of minority teachers, to improve integration of the teaching staff, and to correct disparities of experience, salary and educational level in the distribution of personnel. The plan also advocated goals for integration of faculty based upon a numerical index, legislative replacement of rank order lists with qualifying lists for teacher selection, and a new system of teacher certification and selection.

*Caulfield v. Board of Education of the City of New York, supra,* 583 F.2d at 608.

OCR rejected this compliance plan. Further negotiations during July and August resulted in the promulgation of the September agreement, which is challenged in this lawsuit. The agreement calls for the implementation of a three year plan to eliminate alleged discrimination in the selection and assignment of teachers and supervisors in the City's public schools. The terms, which OCR accepts as compliance with Titles VI and IX as to matters covered, include the following, designed gradually to equalize minority and non-minority teacher distribution throughout the school system and to increase minority hiring and appointment of women supervisors through affirmative action:

1. Not later than September of 1979, the teacher corps of each District in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

2. Not later than September of 1980, each individual school in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

3. The Board of Education will demonstrate to the Office for Civil Rights, subject to prescribed review, that any failure to meet the commitments set forth in paragraphs one and two hereof results from genuine requirements of a valid educational program. In addition, the Board will demonstrate that it has made and is continuing to make special efforts to overcome the effects of educationally-based program exceptions through effective use of such mechanisms as recertification, recruitment and special assignment of teachers.

4. The Board . . . will adopt and implement the following affirmative action procedures, and will sponsor and actively support state legislation at the next session of the Legislature where necessary to accomplish these ends.

(a) Any test used henceforth to determine whether a person is qualified for a teaching position in the system shall be validated prior to its being administered; except that in cases of demonstrable educational necessity . . . a test may be used prior to its validation for temporary assignments, provided that validation shall be accomplished as soon as practicable. . . .

(b) All existing eligibility lists by license shall be combined, and the names of all persons contained thereon shall be

merged with the names of any persons who have passed any new tests, without regard to the dates of examinations.

(c) Rank ordering of persons who have passed examinations for the system shall be abolished.

(d) In employing and assigning teachers pursuant to these modified standards and procedures, the Board . . . will implement affirmative action mechanisms found to be appropriate, such as, for example, giving hiring preferences to all eligible persons with prior experience in the system.

.    .    .    .    .

5. The Board . . . agrees that, in the event that the above-described legislation is not adopted so as to govern employment decisions for the 1978–79 school year, the Board will seek appropriate litigation in support of the agreed objectives.

6. The Board agrees, as soon as practicable to have performed a study of the relevant qualified labor pool by race, ethnicity and sex by an independent expert acceptable to the parties and pursuant to methodology and standards agreed to by the parties. Through the adoption and implementation of the affirmative action procedures and legislation provided in paragraph 4 . . . and other efforts . . . the Board commits that by September of 1980, the levels of minority participation in the teaching and supervisory service will be within a range representative of the racial and ethnic composition of the relevant qualified labor pool.

It is understood that this commitment shall not require the Board to lay off any teacher currently employed by the Board or to hire any teacher who has not met appropriate requirements for employment, not inconsistent with this agreement. It is further understood that the commitment made herein does not establish quotas. Failure to meet this commitment shall not be considered a violation of this agreement if the Board demonstrates that it has implemented the provisions of this agreement in a good faith effort to meet the commitment made herein.

[A footnote to this portion of the agreement stated that "The commitment herein is subject to applicable standards of law. (see *Hazelwood School Dist. v. United States* [433 U.S. 299], 97 S.Ct. 2736 [53 L.Ed.2d 768]."]

.    .    .    .    .

8. The Board . . . commits itself to pursue a program of affirmative action to increase the number of women in the supervisory service, including a plan to reach a systemwide level of participation by women within a range representative of the pool of available qualified women by a date to be agreed upon . . . .. The Board further agrees that it will establish a procedure whereby no person shall be appointed to a supervisory position until an affirmative action officer in the central personnel administration has studied the file of applicants for the particular position and determined that the appointment process demonstrates good faith compliance with the affirmative action plan. . . .

B. The Related ESAA Funding Controversy

In January, 1977—two months after receiving OCR's letter alleging violation of Titles IV and IX—the Board, along with various local school boards, submitted applications for funding under the Emergency School Aid Act, 20 U.S.C. § 1601 *et seq.,* to the Department of Health, Education and Welfare. The funds sought were to provide services for an estimated 40,000 students. In April, 1977, the Board, as instructed by HEW staff, submitted a revised application; HEW officials then informed the Board that the educational programs described in the April, 1977 applications met all HEW programmatic and fiscal requirements and were approved as to content and amount, subject only to a determination that no other legal impediments to funding existed.

In early June, 1977, the applicant school boards were informed that ESAA funding

would be denied for the 1977–78 school term. HEW based this decision upon the conclusions stated in the November 9, 1976 letter from OCR to the Board. Subsequently, HEW modified its position: ESAA funding would be denied solely on the ground of discrimination in assignment of teachers in the City's public schools. But a compromise resulted in ESAA funding being allowed to all the local school district applicants with the exception of District 11; the other local districts had agreed to reassign teachers to eliminate racial disparities in the schools within their control. Pursuant to ESAA regulations, see 45 C.F.R. § 185.46, District 11 and the Board were given an opportunity at an administrative show cause hearing to contest the determination of ESAA funding ineligibility. After the hearing—and one week after the agreement was entered into by the Board and OCR—HEW informed District 11 and the Board that the evidence presented at the hearings had not caused HEW to reconsider its decision. The boards then submitted evidence to HEW in support of waivers of ineligibility, see 20 U.S.C. § 1605(d)(1), 45 C.F.R. § 185.44, but to no avail.

A similar dispute arose with respect to ESAA funding for 1978–1979. Again HEW denied the Board's application for reasons of segregated teaching staffs.

### C. Prior Litigation in this Case

On October 31, 1977, plaintiffs—local school board officials, school boards, supervisors, teachers and parents—filed this action seeking declaratory and injunctive relief voiding the agreement between the Board and OCR. They alleged that, by requiring teacher assignment on the basis of race, the agreement violated Title VI, Title VII, see 42 U.S.C. § 2000e–2, and the fifth and fourteenth amendments. The Council of Supervisors and Administrators (CSA), the United Federation of Teachers (UFT) and various local school boards were permitted to intervene as plaintiffs. Defendants—HEW and the Board—asserted that Titles VI and IX empowered them to reach such an agreement which protects,

rather than violates, the constitutional and statutory rights of New York City residents. Further, HEW—along with intervenor-defendant Ronald Ross (a black New York City School teacher), and amici, the Coalition of Concerned Black Educators, the Public Education Association, and the American Civil Liberties Union—contended that the Board had carried out and maintained a discriminatory and illegally segregated system of teacher hiring and assignment which required the remedial action undertaken by the agreement.

Noting that the parties had presented "substantial substantive questions," see *Caulfield v. Board of Education of the City of New York,* 449 F.Supp. 1203, 1206 (E.D. N.Y.1978), this Court addressed what it identified as a "preliminary matter of transcendent importance." *Id.* at 1206. It found that because the procedures HEW followed did not provide for some form of public participation by those whose rights were so directly affected, HEW had failed to comply with the procedural requirements of Title VI itself, which the Court read as mandating that "drastic governmental action of this nature . . . cannot result solely from secret, informal negotiations conducted exclusively by a handful of government officials." *Id.* at 1206–07. As this Court noted:

> [The primary issue is] due process and the right to a hearing before important administrative action affecting the rights of individuals and institutions is taken. The huge power concentrations in the bureaucracies of our governments must not be permitted to be exercised secretly and arbitrarily. No matter how benign and well-intentioned, those government officials who can, in practical effect, turn on or off the source of hundreds of millions of dollars, must conduct themselves with scrupulous regard for procedural protections. Not only must the result be just, but, if the people are to retain their faith in their government, the means used to achieve the result must be fair.

*Id.* at 1206. The court found that although the UFT had been consulted with respect to the specific terms of the agreement prior to

its adoption, the other parties in the litigation had not been; rather, along with the public, they had been "presented with an accomplished fact." *Id.* at 1212. *See also id.* at 1212–13 (describing interests of intervenors-plaintiffs and intervenors-defendants and lack of consultation with them prior to agreement promulgation). This court summed up the nub of the procedural problem:

> It is disingenuous to suggest . . . that the general discussions about discrimination in the City school system . . . obviated the need for a hearing on the particular terms of the Agreement. In point of fact, announcement of the Agreement came as a surprise to all those indirectly involved as well as the public, save for the small coterie who actually participated in negotiating its terms. No one has ever denied that serious racial problems exist in the schools of the City of New York. The issue was— and is—what specific remedies are to be adopted. On this dispositive point of judgment and power there never was an opportunity for public participation of the kind minimally required. . . . We cannot ignore what every person involved in negotiations—labor, commercial or political—knows: it is the "details," the precise "drafting," not global principles, that are usually the bones of contention.

*Id.* at 1213. This court remanded the case to HEW to devise an appropriate procedural mechanism which would guarantee that those parties affected by the agreement would have at least "an opportunity to voice their opinions" before any agreement was ratified. *Id.* at 1227.

On appeal, the Second Circuit reversed, approving the procedures followed by HEW in promulgating the agreement, and ruling that potentially aggrieved or concerned parties had no right to be heard. *See Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2d Cir. 1978). Rigidly applying the enforcement scheme set forth in 42 U.S.C. § 2000d–1, the court held that neither the statute, nor HEW regulations, "provide for public participation or a hearing when HEW acts informally." 583 F.2d at 614.

Because HEW did not seek compliance by fund termination, but rather by a voluntary agreement, HEW was not required to afford [plaintiffs or others] an opportunity to participate. The action taken here to effect compliance was precisely the type of action contemplated by Congress in using the phrase "voluntary means."

*Id.* In rejecting this court's "totality of circumstances" approach, which had found the agreement something less than voluntary, the circuit court concluded:

> Nevertheless, the district court held that participation was mandatory on the basis that the agreement was not voluntary. The principal reason for the . . . finding of involuntariness was that the City Board, along with the City as a whole, was in the midst of a fiscal crisis and presumably could not afford a fund termination while it litigated the issue of Title VI compliance. But the only fund termination sought by HEW related not to Title VI funds but to [ESAA] funds. To be sure, a threat of potential fund termination lurked in the background since without such leverage voluntary compliance might possibly never be achieved. And after all, if there is lack of compliance, HEW is obligated to enforce the statute ultimately by terminating funds. . . . Undoubtedly then there is a certain amount of coercion inherent in the enforcement scheme. . .
>
> Undercutting any actual coercion, however, are several points. The City Board's own study, the Gifford Report, confirmed the conditions cited in the November 9 letter from OCR. Moreover, the City Board's press release indicated that the agreement had been reached in a spirit of cooperation. . . . The City Board's commitments under the [agreement], despite its impact on teachers and supervisors, came about by the City Board's decision to comply with OCR's interpretation of Title VI, not by any fund-termination action by OCR. . .

In addition, there was ample opportunity to communicate with the City Board between the time the terms of the agreement became publicly known and the time of its ratification, but no party . . sought to participate during that hiatus, although most parties were consulted in the interim.

In any event, the statutory scheme requires a hearing with notice only when HEW seeks fund termination. . . .

*Id.* at 614–15.

The Court of Appeals affirmed this court's holding that it was appropriate for HEW and OCR to require the Board and local districts to furnish data on the racial or ethnic background of students, teachers and supervisors by individual schools. It held that in "the context of this OCR investigation . . ., the collection of racial and ethnic data is authorized by Title VI." *Id.* at 611.

Having characterized the agreement as voluntary both as contemplated by the statute and in fact, the circuit court remanded the challenge to its validity to this court. In so doing, it noted that it had not passed on plaintiffs' contentions that HEW was without jurisdiction to take action upon allegations that employment practices discriminated against minorities, that the practices complained of in the OCR letter did not constitute illegal and unconstitutional discrimination against minorities, and that the agreement and the Board's actions thereunder resulted in illegal "reverse discrimination" and deprived them of liberty and property without due process of law. *See Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 607 n. 1 (2d Cir. 1978). As noted below, it is this court's view that by characterizing the agreement as voluntary in fact, the circuit court substantially defined the appropriate standard for review of the constitutional and statutory validity of the agreement upon remand. *See* Section II, *infra*.

### D. Litigation Regarding ESAA Fund Ineligibility

Following HEW's denial to the Board and District 11 of ESAA funding for the 1977–78 school year, the Board filed suit alleging that the determination of ineligibility was arbitrary, capricious and illegal under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* The facts upon which HEW based its determination are, in certain major respects, identical to those underlying the agreement at issue in this case, for HEW initially based its ruling on the charges of Title VI violations resulting from teacher assignment practices outlined in the OCR letter to the Board. In addition, the resolution by this Court and the Second Circuit of the legal issues surrounding HEW's ESAA determination bear, in some respects, on the legal issues raised in this case. For these reasons—although this court does not suggest that any of the factual determinations or results of the ESAA litigation are binding on the parties to this litigation—it is relevant to briefly review the ESAA litigation.

In *Board of Education v. Califano*, No. 77 ‹ C 1928 (E.D.N.Y., November 18, 1977), this court concluded that because HEW had failed to properly consider evidence proffered in rebuttal by the Board at the administrative show cause hearings held to review the ESAA ineligibility determination, it was necessary to remand the funding dispute to HEW for further administrative consideration.

First, the court concluded that the statistical data relied upon by HEW—data identical to that presented and relied on in part in this case as to the teacher assignment issues—did "lend support to HEW's finding that subsequent to 1972 there was a pattern of assigning teachers by the Central Board in a way that would tend to correlate the race of the teacher with the predominant race of the students in the school . . . [and supported] a direct correlation between the numbers of minority teachers and the percentage of minority students in the City's schools when the schools are broken down into groups of low, medium and high minority school population." *See id.* at pp. 16–20.

Second, the court concluded that the Board had presented substantial evidence at the administrative hearing that there was neither intentional discrimination nor a pattern or practice after 1972 of assigning teachers by race. This evidence—also presented in large part in this case—included a school-by-school analysis of the history of some forty high schools where the minority staff and student populations correlated, arguments that any disparities from an integrated staffing distribution were beyond Board control because caused by state law as to teacher appointment, demographic changes in the New York City public school student population, provisions in ·collective bargaining agreements, low availability of minority personnel in the available labor pool, and incidence and distribution of vacancies only in specific teacher license areas. *See id.* at pp. 25–33. Similar rebuttal evidence—and challenge to the HEW statistics—was presented as to staffing of District 11 schools. *See id.* at pp. 33–38.

Third, the court found that HEW had failed to properly consider the rebuttal evidence submitted by the Board. Instead, it had erroneously relied on an interpretation of the ESAA statute which permitted a statistical disparity alone to constitute a violation. *See id.* at pp. 39–41; *see also* 45 C.F.R. § 185.43(b)(2) ("no educational agency shall be eligible for assistance . . . if . . . it has had or maintained in effect any practice, policy or procedure which results in discrimination . . . including the assignment of . . . teachers . . . in such a manner as to identify any . . . schools as intended for students of a particular race . . .). The Court held that this interpretation of the statute was improper, for it created, in effect, an irrebuttable presumption that disparate ethnic statistics constituted discrimination in violation of the statute. While "statistical disparities alone [may] provide the basis for a rebuttable . . . presumption of discrimination . . . [s]ome aspect of *mala fides*, no matter how remote or indirect, must be attributable to the [school authorities] before they can be found to have illegally racially discriminat-

ed." *Id.* at 42, 44. Thus, the court ruled that, in order to hold the Board ineligible for ESAA funds, HEW would have to make a finding either that

(1) the school board was maintaining an illegally segregated school system on June 23, 1972 and . . . took no effective steps to desegregate after that date or (2) . . . had a practice after [that date] that was segregative in intent, design, or foreseeable effect. It may rely on statistics alone to make this finding, but it may not ignore evidence tending to rebut the inferences drawn from the statistics.

*Board of Education v. Califano,* 77 C 1928 (E.D.N.Y., November 18, 1977) at pp. 49–52. Because HEW had not fairly considered the rebuttal evidence, the court remanded the case to it for further consideration. *Id.* at 52.

After remand, HEW determined that under the standard outlined by this court, the Board and District 11 were ineligible for ESAA funding. Applying the "substantial evidence" standard for review of administrative determinations, *see Board of Education v. Califano,* 77 C 1928 (E.D.N.Y., November 18, 1977) at pp. 53–54, this court upheld HEW's determination. *See Board of Education v. Califano,* 584 F.2d 576, 578 (2d Cir. 1978).

On appeal, the Second Circuit affirmed the determination that the Board and District 11 were ineligible for ESAA funding. *See Board of Education v. Califano,* 584 F.2d 576 (2d Cir. 1978). It disagreed, however, as to the appropriate standard to be applied under the statute for purposes of determining whether unlawful discrimination had been shown. And more importantly for purposes of this case, in so doing the appellate court relied heavily on its interpretation of the appropriate standard under Title VI—the statute now at issue.

The circuit court first noted that 45 C.F.R. § 185.43(b)(2) prohibited teacher assignment practices that served to identify schools as designed for students of a particular race. *Board of Education v. Califano,*

584 F.2d 576, 578–81 (2d Cir. 1978). It then proceeded to review the manner in which teacher appointments and assignments are made in the City's schools under New York law, finding that while decentralization and the examination procedures mandated by New York law in large part controlled the appointment of teachers,

[i]rrespective of how the teachers are appointed, ultimate control still remains with the Chancellor [and the Board]. He retains the power to rescind illegal teacher assignments and to compel a local board's compliance with all applicable provisions of law. In addition, he is vested with all powers and duties of the superintendent of schools of the city district, which include "the power to transfer teachers from one school to another."

Id. at 582 (footnotes omitted). The court then reviewed the statistics upon which HEW had based its initial finding of ineligibility:

Racial and ethnic statistics demonstrated that in school year 1975–76 62.6% of high school students were minority students whereas 8.2% of high school teachers were minority teachers. Seventy percent of minority high school teachers were assigned to high schools in which minority student enrollment exceeded 70%, even though these high schools employed only 48% of the system's high school teachers. Conversely, in high schools in which there were proportionately a low number of minority teachers, minority student enrollments were below 40%.

Similar correlations between the racial/ethnic composition of the faculty of community school districts and the racial/ethnic composition of the student bodies within these school districts exist. For the same school year, 14.3% of the teachers and 69.7% of the students in elementary schools were minority, and 16.7% of the teachers and 70.1% of the junior high school students were minority. Quite clearly, the schools with minority student enrollments over 90% identifiably had the highest percentage of minority faculty by a substantial margin. Similarly, community school districts with minority student enrollments under 50% contained a disproportionately low percentage of minority faculty.

Id. at 583–84 (footnotes containing additional statistical analysis omitted). See also id. at 584–85 (additional statistical data).

Declaring that neither the "substantial disproportions" nor the fact of statistical racial identifiability were contested by the Board, the circuit court proceeded to consider the sole issue before it: whether "the statute and regulation must be construed to require HEW to establish that the disparities resulted from purposeful or intentional discrimination in the constitutional sense." Board of Education v. Califano, 584 F.2d 576, 587–88 (2d Cir. 1978). The court held that they did not:

While appellants argue that HEW's decision to deny ESAA funds relies solely on statistical evidence of disparate impact, contrary to the Supreme Court cases construing the Fourteenth Amendment, we need not reach the question whether the evidence supports a finding of purposive segregative intent. Because we are dealing with an act of Congress, as amplified by HEW regulations, and not with a judicial determination whether certain acts have produced a Fourteenth Amendment violation, it is permissible for Congress to establish a higher standard, more protective of minority rights, than constitutional minimums require. For example, Title VII cases have not required proof of discriminatory motive, at least where the employer is unable to demonstrate that requirements causing a disparate impact are sufficiently related to the job. . .

Here, Congress intended to permit grant disqualification not only for purposeful discrimination but also for discrimination evidenced simply by an unjustified disparity in staff assignments. This conclusion seems clear from the statute which expressly requires that all ESAA "guidelines and criteria . . . be applied uniformly . . . without regard to the origin or cause of such segregation." . . . Moreover, the ESAA proscrip-

*tion against employment discrimination forbids discriminatory acts and practices which violate statutory civil rights provisions such as Title VI of the Civil Rights Act . . . . It is significant that Title VI findings of discrimination may be predicated on disparate impact without proof of unlawful intent.*

*Id.* at 587–89 (citations and footnotes omitted) (emphasis added). Applying this standard, the court held that HEW had properly concluded that

the Central Board failed to present a sufficient justification for the racial disparities in teacher and staff assignments. The proffered justifications for the substantial disparities . . . included (1) restrictions on the transfer of teachers written into the collective bargaining agreement, (2) the desirability of teaching assignments in [nonminority] schools, (3) the unwillingness of many nonminority teachers to teach in predominantly minority schools and (4) the unequal distribution of licenses in specific areas. None of these explanations is adequate to justify the racial disparities in staff assignments. The unequal distribution of licenses resulted from the very examinations which OCR previously determined had produced a racially significant disparate impact [in its November 9, 1976 letter to the Board at issue in this case]. . . . Leaving aside whether the remaining justifications are sufficient as a matter of law, they have not been supported by adduced facts appearing on the record.

*Id.* at 589. The Supreme Court has granted certiorari. *See Board of Education v. Califano*, 440 U.S. 905, 99 S.Ct. 1211, 59 L.Ed.2d 453 (1979).

A second wave of ESAA litigation involved New York City's application for 1978–79 ESAA funding. Despite the fact that the City was presumably carrying out the agreement to eliminate any alleged discrimination in hiring and assignment of teachers and supervisors, HEW took the position that the Board was ineligible for aid since it "had in effect . . . [a]

practice, policy or procedure" of racial discrimination after June 1972. The Board's request for discretionary waiver of ineligibility was denied on the ground that a waiver was not possible until all the effects of discrimination had been fully eliminated. This court held that HEW had an "unduly limited view of its statutory discretionary powers to grant a waiver." *Board of Education of the City of New York v. Califano*, 464 F.Supp. 1114 (E.D.N.Y.1979). Accordingly, it granted an injunction to protect the funds and remanded the application for a 1978–79 waiver to HEW for further consideration. *Id.* at 1127. This case is presently on appeal to the Second Circuit.

## II.

*Parties, Issues and Standard of Review in this Litigation*

It is against this complex administrative, procedural, and litigation background that this court considers plaintiffs' challenges to the September, 1977 agreement. Not surprisingly, the posture of the litigation has caused confusion as to the precise issues before this Court, and a conflict—particularly among defendants—as to the appropriate stance to take in defense of the agreement. Perhaps in the most uncomfortable position has been the Board itself: striving to uphold the agreement as a voluntary action entered into to redress perceived inequalities and reform what it views, in large part, as outmoded and unjust teacher employment and assignment practices largely beyond its direct control, it has understandably been unwilling to admit that it has engaged in intentional or otherwise unlawful discriminatory practices. Instead, drawing a strong analogy to *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), it has urged this court to validate the agreement as a reasonable, voluntary and permissive exercise of its pedagogic and administrative authority over the New York City public school system. The other defendants—HEW, intervenor-defendant black school teacher Ross, and the Coalition of Concerned Black Educators—urge the

same result; they, however, would be quite satisfied (and have introduced evidence towards this end) to have this court declare the Board in violation of Title VI, Title IX, and the Constitution.

Plaintiffs (a local school board, teachers, parents, and school supervisors) along with intervenors-plaintiffs (the Council of Supervisors and Administrators and the United Federation of Teachers), of course take a diametrically different view. They seek to bring this case squarely within the parameters of *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Thus, they argue that the agreement sets up what amounts to a quota system mandating the hiring and assignment of teachers and supervisors on the basis of race. And because, they urge, there has been no judicial or formal administrative finding of intentional discrimination by the Board in violation of the fourteenth amendment (a standard they view as applicable also to Titles VI and IX), and the evidence will not support such a finding, *Bakke* will not permit the remedial measures contemplated by the agreement. In addition, plaintiffs argue that under Titles VI and IX, HEW was without jurisdiction to investigate the employment practices of the Board, and thus to draw the Board into the statutory enforcement scheme which resulted in promulgation of the agreement.

Thus, the issues in this case emerge as follows: First, under Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, did HEW through OCR have jurisdiction to investigate and seek compliance with regard to the employment practices of the Board outlined in the November 9, 1976 letter from OCR to the Board? Second, if so, does the agreement entered into by the Board and OCR to resolve the allegations of statutory noncompliance result in impermissible "reverse discrimination" violative of plaintiffs' rights under the equal protection clause of the fourteenth amendment, the implied equal protection principle of the fifth amendment, or under Titles VI and IX, or otherwise deprive plaintiffs of liberty or property without due process of law in violation of the fifth or fourteenth amendments?

For the reasons discussed in Section III, *infra*, HEW and OCR did have jurisdiction, under both Titles VI and IX, to investigate the employment practices challenged in the November 9, 1976 letter to the Board. While it is true that Title VI contains a provision exempting from its coverage employment practices except where employment is a "primary objective" of financial assistance, *see* 42 U.S.C. § 2000d–3, and that Title IX has been read implicitly to include such a provision, there is no need to reach the issue of whether the financial assistance involved in this case had as a primary objective the provision of employment. Rather, under the particular facts and circumstances of this case, what has been termed the "infection" theory of jurisdiction applies: because those practices HEW and OCR investigated had or could have a discriminatory effect upon students, who are the direct beneficiaries of the financial aid, HEW action was appropriate.

In determining the appropriate standard of review, this court is bound by the Second Circuit's determination in *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2d Cir. 1978), that the agreement at issue must be deemed "voluntary" both as a matter of law under Titles VI and IX and as a matter of fact. Thus, in many respects, the analogy of this case to *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), is a powerful one. Titles VI and IX encourage voluntary steps by federal and local governmental agencies to eliminate possible discrimination in programs receiving federal financial assistance; the statutes require attempts at conciliation before federal officials may initiate formal enforcement efforts. *See* 42 U.S.C. § 2000d–1; 20 U.S.C. § 1682. *See also Alabama NAACP State Conference of Branches v. Wallace*, 269 F.Supp. 346, 351–52 (M.D.Ala.1967) (three-judge court); *Citizens Legal Defense Alliance v. Department of Health, Education and Welfare*, No. CV

76–1614 (C.D.Cal., June 24, 1977) (upholding compliance agreement with regard to employment practices of Los Angeles school system). Since the Title VI and IX voluntary compliance scheme is initiated by federal government investigation and transmittal of evidence outlining specific allegations of statutory violations, there is added assurance that any voluntary remedial measures adopted will redress possible discriminatory practices on the part of the fund recipient itself (here, the Board). The argument for a plan designed to avoid future racial and sex discrimination is thus much stronger here than it was in either *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) or *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). It is inappropriate, as the Second Circuit has implicitly ruled in *Caulfield*, to require a formal administrative or judicial finding of discrimination, whether in violation of the Constitution or some lesser statutory standard, before such remedial action may be taken.

■ The agreement must be judged essentially by the standards applied in judicial review of class action settlements. The issue for determination is simply whether the parties entering into a Title VI or IX remedial plan had a reasonable basis for believing that the practices at issue might result in liability, and whether the remedial measures adopted are reasonable in view of the perceived liability. *Cf., e. g., Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity*, 514 F.2d 767, 771 (2d Cir. 1975) (district judge must "satisfy himself that the settlement agreement was equitable to all persons concerned and in the public interest"); *Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 278 (N.D. Cal.1976) (court must conclude settlement is fair, reasonable and adequate; "The most important factor to be considered is the strength of the plaintiff's case. . . . [but] the court should not endeavor to make a final determination of liability . ."); *Armstrong v. Board of School Directors of the City of Milwaukee*, 471 F.Supp. 800 (E.D.Wis.1979) (approval of proposed plan to remedy pupil segregation) (same). *See generally* 3B Moore's Federal Practice, ¶ 23.80[4] at pp. 23–515—23–528. Any voluntarily agreed resolution of the dispute may not, of course, violate the rights of third parties.

As noted in Sections IV and V, *infra*, the extensive evidence presented at trial demonstrates that the Board and OCR had a reasonable basis for entering into the agreement and that it was reasonable for the Board to conclude (though it does not preclude a contrary conclusion) that had it gone to litigation (whether administrative, if OCR had been forced to initiate formal hearings to effect a fund cutoff, *see* 42 U.S.C. § 2000d–1; 45 C.F.R. §§ 80.8—80.10, or judicial, had OCR elected to seek compliance by "any other means authorized by law," *see* 42 U.S.C. § 2000d–1(2)) it would have been found in violation of Title VI and Title IX. Moreover, the remedial measures embodied in the agreement represent a reasonable resolution of the charges of statutory violation levelled by OCR. First, they constitute a fair attempt to remedy the scope of the violations alleged. Second, they do not straightjacket the Board into an abdication of its primary pedagogic and administrative authority over the New York City school system, but rather provide for flexibility and consideration of the Board's preeminent responsibility for assuring the best possible education of the city's school population. Third, they represent measures which the Board could have chosen to initiate on its own in the exercise of its authority over the school system. Fourth, when viewed against what the Board could reasonably have believed would have been a judicial remedy had OCR elected to seek such a remedy, or had a class of private plaintiffs sought such a remedy, they emerge as a reasonable accommodation. And finally, because the remedial measures in fact establish goals and not rigid quotas, and because they do not restrict the opportunities of any of the plaintiffs (or any person) to seek or hold employment in the school system, they do not as presently structured impact in an unconsti-

tutional or statutorily violative fashion on plaintiffs' rights.

## III.

*Preliminary Issues: Standing and Jurisdiction*

### A. Standing

■ At this stage of the litigation, defendant HEW and defendant-intervenor Ross question the standing of all plaintiffs to challenge the September, 1977 agreement and the jurisdictional appropriateness of OCR's inquiry into the Board's employment practices. It would be unjust to deny standing to these plaintiffs. They must be given their day in court.

First, in *Caulfield v. Board of Education of the City of New York*, 449 F.Supp. 1203, 1221–23 (E.D.N.Y.), *aff'd in part and rev'd in part on other grounds*, 583 F.2d 605 (2d Cir. 1978), this court considered, in some detail, the standing issue. It found that plaintiff teachers, supervisors and administrators might suffer "injury in fact" as a result of implementation of the agreement. *See* 449 F.Supp. at 1222–23. Even though one of the types of injury identified by the court—that resulting from possible forced transfers of teachers and administrators— may arguably not be ripe for consideration at this time, since the Board now takes the position that the agreement will not require it to execute such transfers, and the Board and OCR have agreed that the assignment provisions of the agreement will not apply to supervisors at least pending further negotiations, the other injuries identified by the court still remain. Plaintiffs have thus suffered " 'some threatened or actual injury resulting from the putatively illegal action.' " *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Apart from this "minimum constitutional mandate," 422 U.S. at 499, 95 S.Ct. 2197, plaintiffs have standing under the additional prudential considerations relevant to invocation of federal court jurisdiction. They do not present the court with a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," *id.; cf. Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Rather, they have demonstrated sufficiently that "the challenged practices harm [them], and that [they] personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). *See also Caulfield v. Board of Education of the City of New York*, 449 F.Supp. 1203, 1223 (E.D. N.Y.1978).

Second, policy considerations support standing. Because the Second Circuit has determined that plaintiffs had no right to be heard in the process that lead to the promulgation of the agreement, *see Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2d Cir. 1978), if plaintiffs are to be heard at all, they must be heard in this court. To deny such a hearing in the circumstances of this case would work an injustice: it would permit a federal agency and a local governmental agency, under the banner of "voluntarism", to take far-reaching steps affecting vital societal institutions and substantial individual interests without question or challenge from directly effected parties. *See* Tribe, *Seven Pluralist Fallacies: A Reply to Mr. Justice Rehnquist*, 38 U.Miami L.Rev. 43, 46–47 (1978).

Finally, it is at least implicit in the Second Circuit opinion in *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2d Cir. 1978), that that court viewed plaintiffs here as possessing standing. *See id.* at 607 n. 1 (outlining issues for resolution on remand). Given the short shrift that court accorded concerns for plaintiffs' participation in the process leading up to the promulgation of the agreement, it is hardly conceivable that had the Second Circuit perceived any serious standing issue in this case, it would have not have passed directly on the issue.

### B. Jurisdiction

Plaintiffs argue that under Title VI and Title IX, HEW and OCR had no jurisdiction

to investigate or seek compliance with regard to the Board's teacher and supervisory employment practices. In their Title VI argument, they proceed from the language of the statute. On the Title IX issue, they argue an implied exclusion. As to both, they urge that insofar as HEW regulations authorize investigation and action respecting employment practices, those regulations are invalid as beyond the scope of the authorizing statutes.

1. Title VI of the Civil Rights Act

Title VI, 42 U.S.C. § 2000d, provides that:

No person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d–1 sets forth the duty and requirements of federal agency enforcement of the § 2000d prohibition. 42 U.S.C. § 2000d–3 limits the scope of § 2000d–1:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer . . . except where a primary objective of the Federal financial assistance is to provide employment.

Plaintiffs argument against HEW and OCR jurisdiction proceeds directly from the language of § 2000d–3: they view OCR's investigation, letter, and the agreement in this case as directed at the Board's teacher and supervisory employment practices; because, they urge, almost none (if any) of the federal grants to the Board has as a "primary objective" the provision of employment, the statute itself barred OCR's efforts.

Under the circumstances of this case, it is not necessary to address the issue whether any of the federal assistance to the Board had as a primary objective provision of employment. Nor is it a dispositive semantic consideration whether, under § 2000d–3, federal grants may have several primary objectives, or merely one; there is no need to consider whether "a primary objective"

is to be read as "the primary objective." Cf. Tr. at 744 (testimony of former OCR director Martin Gerry) (program of assistance may have several primary objectives); id. at 741–49, 960–65 (Gerry questioned by plaintiffs' counsel as to primary objective of various federal grants to Board). OCR simply did not act under a theory that it could take action with regard to the Board's employment practices because a primary objective, however defined, of the federal assistance was the provision of employment. See Tr. at 631–37, 741–49, 960–65 (testimony of Gerry).

Rather, OCR proceeded, in large part, under the authority of 45 C.F.R. § 80.-3(c)(3), as outlawing discriminatory teacher employment practices which cause discriminatory effects on school children who are clearly intended as primary beneficiaries of federal largesse. It reads in part:

When a primary objective of the Federal financial assistance is not to provide employment, *but discrimination on the ground of race, color or national origin in the employment practices of the recipient . . . tends, on the ground of race, color or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies,* the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient . . . *to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.*

(emphasis added). In sum, the regulations provide that where oversight of a recipient's employment practices is required to protect direct beneficiaries from discrimination—in other words, where discriminatory employment practices have a discriminatory effect upon direct beneficiaries—HEW and OCR may take action under Title VI to redress those practices and effects.

In this case, OCR has alleged, in summary, that the hiring and assignment practices of the Board—when viewed against the backdrop reality of a school system that, *de*

*facto* or otherwise, contains a large number of schools populated predominantly by either majority· or minority students—result in the bulk of minority staff being assigned to minority schools while majority schools have relatively few minority teachers. This, OCR contends, creates or reinforces a picture of schools in the system being designed for students of either majority or minority race. With specific regard to the Board's hiring practices, OCR argues that those practices which rely on employment through examinations promulgated by the Board of Examiners have the effect of disproportionately excluding black and other minority teachers from the system. In addition, OCR points out that a result of the Board's hiring and assignment practices has been to provide minority schools with less experienced, lower salaried teachers who have completed fewer graduate courses; this, OCR charges, has the effect of denying minority students equal educational opportunity.

In *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir. 1966), *aff'd en banc,* 380 F.2d 385 (5th Cir.), *cert. denied sub nom. Caddo Parish School Board v. United States,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), the court rejected the argument that 42 U.S.C. § 2000d–3 barred HEW from taking action under Title VI with regard to teacher hiring and assignment practices. See 372 F.2d at 881–86. After reviewing the legislative history of §§ 2000d and 2000d–3, Judge Wisdom concluded that,

> In its broadest application [the argument that § 2000d–3 barred action with regard to teacher employment practices] would allow racial discrimination in the hiring, discharge, and assignment of teachers. In its narrowest application this argument would allow discrimination in hiring and discharging but not in assigning teachers, an inexplicable anomaly. There is no merit to this argument. . . . Faculty integration is essential to student desegregation. To the extent that teacher discrimination jeopardizes the success of desegregation, it is unlawful wholly aside from its effect upon teachers.

> . . . . .

Congress did not, of course, intend to provide [in Title VI] a forum for the relief of individual teachers who might be discriminatorily discharged; Congress was interested in a general requirement essential to success of the program as a whole.

> . . . . .

[§ 2000d–3] was never intended as a limitation on desegregation of schools. If the defendants' view of [the statute] were correct the purposes of the statute would be frustrated, for one of the keys to desegregation is integration of faculty.

*Id.* at 882–83.

The view that segregation in the allocation of faculty is part and parcel of the problem of school segregation, and that it must be remedied if the effects of segregation on students are to be ameliorated, finds strong support in a long line of Supreme Court and lower court decisions. Preeminent is *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971):

> [W]here it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff . . . a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

*See also Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979) (Court cites *Swann* with approval; adopts Court of Appeals' conclusion that teacher segregation "[serves] to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also serve[s] as discriminatory, systemwide racial identification of schools," *id.,* 99 S.Ct. at 2951); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Court reaffirms "relevance of segregated faculty assignments as one of the factors in proving the existence

of a school system that is dual for teachers *and* students," *id.,* 99 S.Ct. at 2978 n. 9; cites fact that only after HEW intervened under Title VI did "faculty segregation disappear . . . completely," *id.* at 2980 n. 11); *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 2758–59, 53 L.Ed.2d 745 (1977) (Court reaffirms fact that faculty desegregation is critical to eliminating or ameliorating effects of student segregation), *aff'g* 540 F.2d 229, 247 (6th Cir. 1976) (faculty integration "helps to mitigate the fact that the majority of Detroit's children are left in schools that are overwhelmingly one race [and] serves to provide . . . children with the maximum desegregation experience possible under the circumstances"); *Keyes v. School District No. 1,* 413 U.S. 189, 196, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (segregative teacher assignment policies relevant in identifying segregated schools), *on remand,* 521 F.2d 465, 484 & nn. 23, 24 (10th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976) (faculty desegregation crucial to successful integration plan; where percentage of minority teachers is low, disproportionate assignment to schools with predominantly minority students is faculty segregation); *Davis v. Board of School Commissioners,* 402 U.S. 33, 35, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) (Court reaffirms *Swann;* requires schools to have faculty ratio in each school substantially the same as in district as a whole); *United States v. Montgomery County Board of Education,* 395 U.S. 225, 231–35, 89 S.Ct. 1670, 1674, 23 L.Ed.2d 263 (1969) (faculty desegregation "an important aspect of the basic task of achieving a public school system wholly free from racial discrimination"); *Bradley v. School Board, City of Richmond,* 382 U.S. 103, 105, 86 S.Ct. 224, 225, 15 L.Ed.2d 187 (1965) ("no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plan is entirely speculative"; court must consider effect of faculty segregation); *Rogers v. Paul,* 382 U.S. 198, 200, 86 S.Ct. 358, 360, 15 L.Ed.2d 265 (1965) (students have standing to sue on theory that "racial allocation of faculty denies them equality of educational opportunity without regard to segregation of pupils"); *Otero v. Mesa County Valley School District,* 568 F.2d 1312, 1314 (10th Cir. 1978) (students have standing to challenge, on Title VI grounds, discriminatory teacher hiring practices on basis of allegation that they have an adverse effect upon educational opportunity); *Morgan v. Kerrigan,* 530 F.2d 431, 432–33 (1st Cir. 1976) (faculty hiring, promotion and transfer policies violate the rights of students), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), *aff'g* 379 F.Supp. 410, 457–66 (D.Mass.1974) (faculty assignment practices resulted in less qualified, less experienced teachers in predominantly minority schools; right of students to equal educational opportunity violated); *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1218 (5th Cir.), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 611, 612, 24 L.Ed.2d 530 (1970) (faculty segregation must be remedied so that "in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students").

If any further demonstration were necessary that, in the school context, HEW's determination under 45 C.F.R. § 80.3(c)(3) that discrimination in teacher employment practices on the grounds of race may result in discrimination against students who are the direct beneficiaries of federal assistance, it was provided by the testimony in this case of Dr. Kenneth Clark:

> The period since 1954 has only served to reinforce the conclusions that I had advanced at that time, regarding the deleterious impact of segregated school systems and the positive value of an integrated system. My research, experience and reading in the field has led me to conclude that desegregation generally improves the quality and value of the educational experience for minority students. In a segregated school system where schools can be identified as and are perceived of as "black" or "white" the community as a whole and students in particular perceive of the quality of the education in the black schools as inferior. That

perception becomes a self-fulfilling prophecy.

. . . . .

It is not minority students alone, who are injured by educational segregation. As I stated in the social science material that I prepared in connection with *Brown v. Board of Education,* segregation undermines the quality of education for white students as well as black. Public education serves a broader purpose than instruction in the basic academic skills. Education aims to free the human mind from irrational fears, superstition and hatred. It also functions to broaden cultural horizons and to eliminate stereotyped beliefs and behavior. Segregated education cannot perform these broader functions. . . . [T]he values and attitudes that are transmitted to our children by the continued existence of a segregated faculty are those of an unequal and racist society.

. . . [T]he racial and ethnic segregative patterns which are pervasive throughout the New York City school system are clearly injurious to the intended beneficiaries of that system, the students.

. . . *When student segregation is reinforced, as it is by patterns of faculty segregation, the unfortunate impact of school segregation becomes that much more acute.*

Affidavit of Dr. Kennth Clark (Def.-Int. Ross' Ex. 124) at ¶¶ 14, 18, 19 (emphasis added); *see also* Tr. at 1798–99, 1804–05, 1836, 1839–41 (testimony of Dr. Clark). *Cf. Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 1594–96, 60 L.Ed.2d 49 (1979) (noting critical role of schools in our nation in transmitting basic values on which our democracy rests, and, in particular, importance of teachers as role models and value transmitters).

Other courts which have considered the propriety of HEW's exercise of Title VI jurisdiction under circumstances analagous to those present in this case have upheld the jurisdiction, or indicated its validity. *See, e. g., United States v. El Camino Community College District,* 454 F.Supp. 825 (C.D.

Cal.1978); *Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068, 1078, 1079 (5th Cir. 1969) (dictum); *United States v. Frazer,* 297 F.Supp. 319, 322 (M.D.Ala. 1968) (dictum); *Citizens Legal Defense Alliance v. HEW,* No. CV 76–1614 (C.D.Cal., June 24, 1977) (implication). *Cf. Brown v. Weinberger,* 417 F.Supp. 1215 (D.D.C.1976) (requiring expeditious HEW compliance investigations and enforcement proceedings in pending cases, including that of New York school system); *Marable v. Alabama Mental Health Board,* 297 F.Supp. 291 (M.D.Ala.1969) (equal protection violation in staff segregation at mental institutions by analogy to school segregation cases; implication that jurisdiction exists under Title VI).

Under the circumstances of this case, HEW and OCR had jurisdiction to investigate whether or not the Board's employment practices were in compliance with Title VI and, upon concluding that they were not, to seek enforcement (whether through voluntary compliance or otherwise) of the statutory proscription. Discrimination by race in the hiring and assignment of teachers or supervisors, as a matter of law and of fact, constitutes discrimination against students. And because students are clearly the ultimate beneficiaries of federal assistance to school systems, HEW's regulation 45 C.F.R. § 80.3(c)(3), as applied to this case, constitutes a valid interpretation of the statutory mandate.

### 2. Title IX of the Education Amendments

Title IX, 20 U.S.C. § 1681, provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

While the statute contains no specific employment exclusion provision comparable to that of Title VI of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000d–3, the courts have been virtually uniform in implying

such an exception to its mandate. They reason that (1) Title IX was modeled on Title VI, *see Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 1951, 1956–57, 60 L.Ed.2d 560 (1979); (2) Title IX was originally contemplated as an amendment to Title VI adding sex discrimination in educational programs to the prohibitory language; (3) Title IX was enacted as part of a broader package that included amendment of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, to include prohibition of sex discrimination in employment and of the Equal Pay Act, 29 U.S.C. § 206(d), to provide the Secretary of Labor jurisdiction to regulate discrimination in compensation in educational employment, and these latter statutes were designed to regulate employment; and (4) Title IX's coverage exceptions, *see* 20 U.S.C. § 1681(a)(1)–(9), indicate a congressional intent to closely confine the statute's coverage of discrimination against students, so that if Congress had intended the statute to cover employment discrimination, it would certainly have written those provisions to cover employment practices of the excluded programs. *See Romeo Community Schools v. HEW*, 438 F.Supp. 1021, 1029–34 (E.D. Mich.1977). *See also Junior College Dist. of St. Louis v. Califano*, 597 F.2d 119 (8th Cir., 1979), *aff'g* 455 F.Supp. 1212 (E.D.Mo.1978); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir., 1979); *Board of Education of Bowling Green v. HEW*, 19 F.E.P. Cases 457 (N.D.Ohio 1979); *Brunswick School Board v. Califano*, 17 F.E.P. Cases 475 (D.Me.1978); *Seattle University v. HEW*, 16 F.E.P. Cases 719 (W.D.Wash. 1978).

The only sex discrimination claim at issue in this case is OCR's charge in the November 9, 1976 letter that the Board, on the basis of sex, has "denied females equal access to positions as principals and assistant principals throughout the system." The agreement addresses this concern by requiring the Board to take affirmative action to increase the number of women in supervisory positions to approach their representation in the qualified labor pool, and by mandating review of supervisory appointments to insure that the process has conformed to the affirmative action plan. *See* Agreement, ¶ 8.

HEW regulations elucidating the scope of Title IX's coverage of employment practices are extremely broad. As a general proposition, the department apparently takes the view that the statute does permit it to directly monitor a wide range of grantee employment practices. *See, e. g.,* 45 C.F.R. § 86.51(a)(1) (no covered grantee may discriminate on grounds of sex in employment or recruitment); 45 C.F.R. § 86.51(b) (prohibited practices include discrimination in recruitment, hiring, promotion, rates of pay, assignments, fringe benefits, pregnancy leave, social events). *See also* 45 C.F.R. § 86.6 (requirements of Title IX independent of those of Title VII of the Civil Rights Act and the Equal Pay Act).

It would be hard to sustain HEW's Title IX jurisdiction in this case under the direct authority of the department's "employment" regulations, 45 C.F.R. §§ 86.51–86.61. As noted above, the cases considering the validity of these regulations have almost uniformly concluded that they are beyond the authority granted by the statute. *See Romeo Community Schools v. HEW*, 438 F.Supp. 1021 (E.D.Mich.1977) (discrimination in pregnancy policies not reached by Title IX; 45 C.F.R. §§ 86.51 *et seq.* invalid); *Junior College Dist. of St. Louis v. Califano*, 597 F.2d 119 (8th Cir. 1979), *aff'g* 455 F.Supp. 1212 (E.D.Mo.1978) (differential compensation claim not reached by Title IX; 45 C.F.R. §§ 86.51, 86.54 invalid); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir., 1979) (pregnancy policies not reached by Title IX); *Board of Education of Bowling Green v. HEW*, 19 F.E.P. Cases 457 (N.D.Ohio 1979) (compensation claim not reached by Title IX; 45 C.F.R. §§ 86.51, 86.54 invalid); *Brunswick School Board v. Califano*, 17 F.E.P. Cases 475 (D.Me.1978) (discrimination concerning marital, parental or family status not reached by Title IX; 45 C.F.R. § 86.57(c) invalid); *Seattle University v. HEW*, 16 F.E.P. Cases 719 (W.D.Wash. 1978) (compensation claim not reached by Title IX; 45 C.F.R. §§ 86.51 *et seq.* invalid).

In this case, however, it appears that HEW proceeded on another theory of Title IX jurisdiction. As former OCR director Martin Gerry (who presided over the investigation of the Board) testified:

I think it's the same point [with regard to jurisdiction under Title VI] which was my view [that] the question of program activity and impact on beneficiaries are separate issues. Title VI [and IX] [in] my judgment [cover] any employment category where the person in the category has a direct or consequential contact with beneficiaries—students, so, therefore, it covers . . . principals, assistant principals, counselors, other personnel of this sort. . . . [The] principle objective [of the funding issue] is never reached because in fact the employment categor[ies] themselves so directly bear on the rights of beneficiaries and treatment of beneficiaries that any person in those categories of employment are going to be reached through the students.

Tr. at 963–64. See also Tr. at 632.

To the extent that this jurisdictional theory proceeds on the general assumption that wherever a grantee's employee has substantial contact with a direct beneficiary, all the grantee's employment practices with regard to that employee are subject to Title IX, it is overbroad under the teaching of the *Romeo* line of cases. But insofar as this theory proceeds by analogy to that accepted for reaching school employment practices under Title VI—that such practices may be reached where there is an arguable discriminatory impact on direct beneficiary students—it provides a colorable basis for the exercise of jurisdiction in this case.

Decisions by the United States Supreme Court involving allegations of sex discrimination violative of the fourteenth amendment have stressed, in large part, that the constitutional guarantee protects against legislative classifications, or state action, which rest on stereotypic, overbroad or archaic generalizations about the respective roles, qualities and fitness of the sexes. *See, e. g., Personnel Administrator of Mas-*

*sachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (dicta) ("keeping women in a sterotypic and predefined place" is impermissible legislative purpose); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 1195, 51 L.Ed.2d 360 (1977) (dicta) (" 'archaic and overbroad generalizations' about women . . . or . . . 'the role-typing society has long imposed' upon women . . . such as casual assumptions that women are 'the weaker sex' " suspect); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 1026–27, 51 L.Ed.2d 270 (1977) (classification forbidden "when supported by no more substantial justification than 'archaic and overbroad' generalizations . . . or 'old notions' . . . that are more consistent with 'the role-typing society has long imposed' . . . than with contemporary reality"); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976) ("increasingly outdated misconceptions concerning the role of females in the home rather than in the 'marketplace and world of ideas' [have been] rejected as loose-fitting characterizations incapable of supporting . . . statutory schemes that were premised upon their accuracy"); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 1378, 43 L.Ed.2d 688 (1975) ("No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and world of ideas. . . . Women's activities and responsibilities are increasing and expanding. . . . The presence of women in business, in the professions, in government and, indeed, in all walks of life where education is a desirable, if not always a necessary, antecedent is apparent and a proper subject of judicial notice."); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975) (" 'archaic and overbroad' generalization . . . 'not . . . tolerated under the Constitution' "). *Cf. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) ("it is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotyped characterization of the sexes").

■ Allegedly discriminatory practices which intend or result in limited access of women to, and small numbers of women in, supervisory school positions may well retard our society's effort—as reflected in congressional legislation and Supreme Court cases construing the equal protection clause—to eradicate outdated and stereotypic notions about the proper role of women. For example, the Court takes judicial notice of the fact that historically in New York City, a large percentage of the teaching force, particularly at the lower school levels, has been composed of women. Fed.R.Evid., Rule 201. If, in fact, women are not appropriately represented in the higher levels of the school hierarchy, students—male and female—may well be presented with the notion that while women may teach, they are not suited, or qualified, to occupy positions of added authority and broader responsibility. Such an impression might well carry over to a view of the appropriate role of women in society as a whole. In considering the possible deleterious effect of allegedly sexually discriminatory school employment practices on students, one cannot ignore that,

> [p]ublic education . . . 'fulfills a most fundamental obligation of government to its constituency.' The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, long has been recognized by [Supreme Court] decisions . . . . These perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists.

Ambach v. Norwick, 441 U.S. 68, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49 (1979) (citations omitted).

■ This is not to suggest that the possible effect of sexually discriminatory school employment practices on students is as clear or severe as that of racially discriminatory practices, nor that our society's discrimination against women—often based on outmoded notions rather than animus—is as pernicious or historically ingrained in law and practice as that against blacks. All this court concludes is that HEW could reasonably proceed in this case under Title IX on a theory that school employment practices which involve systemic discrimination against women in access to supervisory positions had, or would have, a deleterious impact on students as direct beneficiaries of federal financial assistance. This conclusion is supported by dicta in those cases rejecting direct HEW purview over employment practices under Title IX indicating that, under different circumstances, the "infection" theory of jurisdiction would permit HEW to regulate certain such practices. See, e. g., Islesboro School Committee v. Califano, 593 F.2d 424, 430 (1st Cir. 1979) ("[a] nexus between the discrimination against employment and its effects upon students must first be shown"); Brunswick School Board v. Califano, 17 F.E.P. Cases 475, 481 (D.Me.1978) (practice must "ultimately have a discriminatory effect on students").

IV.

*Evidence*

■ The evidence presented at trial supports the allegations made in the November 9, 1976 letter from OCR to the Board, and the remedial provisions of the September, 1977 agreement. There was a legal basis for OCR's charges and the remedial measures. As emphasized in Section II, *supra*, it is both unnecessary and inappropriate to decide whether the Board practices in question would dictate a finding of discrimination—either under an "intent" standard or an "effects" standard, in violation of the Constitution or the statutes. Rather, the sole purpose of the presentation here is in connection with the issues of fact and law presented by this particular case: whether, given all the evidence, (1) the parties (and particularly the Board) could have reasonably believed a violation of the Constitution or the statutes could be shown; and (2) the measures adopted by the agreement represent a fair and reasonable effort to re-

solve any such reasonably perceived violations of law.

## A. Background

In order to properly assess what would have been the Board's reasonable belief as to the validity and effect of the charges leveled by OCR, and to put those charges in context, it is necessary first to understand (1) the legal framework under which the Board makes its teacher hiring and assignment decisions; (2) the historical backdrop of criticism of this framework and its effects; (3) the procedures the Board has used in making assignment decisions; and (4) the changing characteristics of the New York City school system's student population.

### 1. Statutory Framework

Hiring and assignment of teachers in New York City schools is largely governed by New York Education Law. In recent years, that law has governed hiring and assignment in two different ways.

#### a. Prior to Decentralization

Prior to 1969, hiring and assignment of teachers to schools was accomplished directly under the jurisdiction of the Board and its Superintendent. Pursuant to N.Y. Educ.Law § 2573(10) teacher appointments in the city were made on a competitive basis. A Board of Examiners, see N.Y. Educ.Law § 2569, developed and conducted competitive examinations for pedagogical positions. Candidates for permanent elementary school positions normally were licensed by a general examination (now known as "common branches"), and for kindergarten ("early childhood"). Candidates for appointment to junior high and high schools were licensed by examination in specific subject areas (e. g., "math, junior high school," "English, high school"). The Board of Examiners set a passing score for each examination. Promulgated lists of eligible candidates were then given to the Board with passing candidates ranked in order of performance on the examination. The Board would then appoint, in order of their rank on the list, candidates as teachers and assign them to teaching positions in the city's schools. Under the Education Law, see N.Y.Educ.Law § 2573(10), lists in a given area could not be "merged"; rather, the Board was required to offer appointment to all persons on a list from an earlier examination before it could offer appointment to any person on a list from a later examination, unless the earlier list's statutory life had expired. The Education Law also permitted assignment of persons with substitute licenses to teaching positions where there were an insufficient number of regularly licensed teachers to fill vacancies. The eligible lists have never identified or described the race, color, or national origin of candidates for teacher assignment.

This "competitive" examination process was only mandated in the large cities of New York and Buffalo. In all other cities and school districts of the state, the legislature authorized school boards to appoint teachers who met minimum requirements set by the State Commissioner of Education and the Education Law; each board was free to set additional or higher qualifications and examine for them. Only in New York City was a separate, independent Board of Examiners required. See N.Y. Educ.Law §§ 2573(9), (10), (10–a); 2569.

#### b. Following Decentralization

In 1969, jurisdiction over the city's elementary and junior high schools was largely transferred to 32 Community School Districts. See N.Y.Educ.Law § 2590. Under the new law, hiring and appointment of teachers is accomplished in three ways.

First, for the city's high schools, which remain under the jurisdiction of the Central Board and its Chancellor, the method is the same as under pre-decentralization law. Teachers are appointed from rank order examination lists by the Chancellor directly to the schools. See N.Y.Educ.Law §§ 2590–j(4)(a); 2590–j(3)(a), (b).

Second, schools under the jurisdiction of the Community School Districts are divided for purposes of teacher appointment into two categories. Those schools with average reading scores above the 45th percentile citywide (non-45% schools), receive teacher

appointments from rank order eligible lists, as prior to decentralization. The difference is that the Chancellor—rather than appointing teachers to schools directly as was formerly the case—assigns teachers from the rank order lists to the district, which then assigns teachers to individual schools within the district. While the districts must abide by the Chancellor's designation, the law directs the Chancellor "[i]nsofar as practicable [to] . . . give effect to the requests for assignment of specific persons by the community board." N.Y.Educ.Law § 2590–j(4)(c); § 2590–j(3)(a), (b).

Third, those schools whose students rank in the lower 45% on the reading examination (the 45% schools), have available an alternate appointment method. For these schools, the district may appoint: (1) any person who has passed a Board of Examiners' qualifying examination, or who appears on any existing competitive eligible list, without regard to that person's rank order on the list (the "out of rank order" method); or (2) any person who has passed the National Teachers Examination administered by the Educational Testing Service at a pass mark equivalent to the average pass mark required by the five largest cities in the nation using this examination (the "NTE" method). These teachers, like all others, must of course meet the minimum requirement set by state law. See N.Y. Educ.Law § 2590–j(5)(c). Districts may also appoint to their 45% schools via the regular appointment method. See N.Y. Educ.Law § 2590–j(5)(d). In addition, where a teaching vacancy exists in a non-45% school, and no names appear on any appropriate eligible lists, the district may fill the vacancy through the NTE method. N.Y.Educ.Law § 2590–j(6).

Finally, as the Second Circuit concluded in *Board of Education v. Califano*, 584 F.2d 576, 582 (2d Cir. 1978) (footnotes omitted):

> Irrespective of how the teachers are appointed, ultimate control still remains with the Chancellor. He retains the power to rescind illegal teacher assignments and to compel a local board's compliance with all applicable provisions of law. In addition, he is vested with all powers of the superintendent of schools of the city school district, which include "the power to transfer teachers from one school to another."

### 2. Historical Backdrop of Criticism

The legislatively mandated competitive teacher appointment process—and the results that process, as implemented by the Board of Examiners and the Board of Education, has had on the allocation of teachers within the New York City school system—has historically been the subject of harsh criticism in academic, administrative, and judicial contexts. In order to assess what may be termed the "state of mind" of the Board with regard to the hiring and appointment system in general, and the OCR allegations in particular—both from a pedagogical and legal consequences point of view—it is useful to briefly outline this criticism.

In late 1954, in the wake of the Supreme Court's landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Board issued a policy statement which reaffirmed its commitment to equal educational opportunity for all students, and to quality integrated education. Even then, the Board noted the severe obstacles to fully realizing its goal of nondiscriminatory education:

> In seeking to provide effective democratic education for all of the children of this city, the . . . Board . . . [is] faced with many real obstacles in the form of complex social and community problems. Among these problems are the existence of residential segregation which leads to schools predominantly of one race on the elementary and junior high school levels. In addition, prevailing racial attitudes and misinformation of some white and Negro parents reflect outworn patterns of segregation as well as limited educational and vocational horizons which make it difficult for them to accept school procedures contrary to their attitudes.

In spite of these and other difficulties, the Board . . . is determined to accept the challenge implicit in the language and spirit of the [*Brown*] decision . . . We will seek a solution to these problems and take action with dispatch implementing the recommendations resulting from a systematic and objective study of the problem here presented.

"Preliminary Statement of Board of Education Resolution for Action," *reprinted in* Toward the Integration of Our Schools: Final Report of the Commission on Integration 24–25 (1958) (Def.Bd.Ex. 30). The Board appointed a Commission on Integration to study the systemwide problem and recommend remedial action.

In its final report, which covered a broad range of education and related issues, the Commission noted earlier findings which had "sketched the steady deterioration during the preceding twenty years of the education available to [minority] children . . ." Def.Bd.Ex. 30 at 6. A major problem was the "disastrously rapid turnover of teachers in the 'difficult' segregated schools of the [minority] neighborhoods." *Id.* The Commission found that

> [t]he fact is . . . that [a minority] school, having greater problems to face in the execution of an educational program, and therefore needing a more experienced, stable and capable staff, is burdened additionally with inexperienced teachers and a more unstable staff than [a majority] school . . .

*Id.* at 8. But it noted that "it is possible, by the quantitative and qualitative reassignment of school personnel in terms of the proportionate needs of the school populations involved, to reduce and eventually to overcome the present de facto discrimination against the minority groups," *id.* at 9, "even if this should require modification of the present teacher assignment policies and/or the standards of the Board of Examiners." *Id.* at 10–11; *see also id.* at 14. Towards this end, the Commission recommended: that all applicants for promotion to supervisory positions be required to serve a three-year period in minority schools;

that teacher assignment be based on school needs rather than personal preferences of teachers and principals; that a ratio be established by which each school would have a similar proportion of experienced and substitute teachers; that the Board use its power of excessing to transfer teachers so as to equalize allocation of teacher experience; that all vacancies in minority schools be filled by transfer of regular experienced teachers from other schools until resources were equalized; and that all newly appointed teachers be assigned to non-minority schools for the first three years of teaching. *See id.* at 15–16. The Board was urged to "publicly declare and promote a policy of staff integration," *id.* at 16. Finally, the Commission recommended "a reexamination by experts of the present procedures and techniques of the Board of Examiners," because it was likely that those procedures had contributed to a loss to the system of qualified personnel to private industry. *Id.*

The Board approved these recommendations in principle; it reserved, however, the prerogative to further study specific recommendations in light of complex administrative and other problems of implementation. It directed the Superintendent of Schools to take necessary action to carry out the intent and purposes of the Commission report. *See* Def.Bd.Ex. 30 at pp. 28–29.

In 1958, these problems were presented in an interesting context to a judicial forum. Parents of students assigned to heavily minority schools had refused to send their children to those schools on the ground that they offered inferior educational opportunity. They claimed this was due to two factors: the de facto racial segregation of student population, and the discriminatory teacher staffing policies of the Board, which resulted in inferior teachers being assigned to the predominantly minority schools. The Board brought neglect proceedings in New York State Family Court to compel the students' attendance. But Judge Justine Wise Polier upheld the parents' contentions. *See In the Matter of Skipworth*, 14 Misc.2d 325, 180 N.Y.S.2d 852 (Dom.Rel.Ct.1958).

First, Judge Polier found extensive de facto pupil segregation in the city's junior high schools. This, however, was found to be due primarily to "residential segregation not attributable to any governmental action"; no malfeasance or nonfeasance on the part of the Board was responsible. 180 N.Y.S.2d at 863–64. But the court found the Board guilty of discrimination in its teacher assignment policies. While it found that there was a drastic shortage of regularly licensed teachers for junior high schools throughout the City, it concluded that there was a "city-wide pattern of discrimination against [minority schools] as compared to [majority schools]: A far greater percentage of positions in the [minority] schools were not filled by regularly licensed teachers." *Id.* at 867–68. And "no evidence [had been] submitted to show that the Board had adopted any procedure under which correction of the discriminatory imbalance . . . could be reasonably anticipated." *Id.* at 869. Instead, despite the findings of the Commission on Integration, 180 N.Y.S.2d at 870–71, no concrete remedial steps had been taken:

> That the Board of Education is entirely responsible for the existing discrimination in teacher assignments, there is, in my opinion, not the slightest doubt. What the Board did was to let the teachers themselves establish the discriminatory process. . . . Having put the power of assignment in the hands of teachers by default, as far as their choosing or not choosing to teach in [a minority] school . . . the Board is bound by the acts of its servants.

> . . . . .

> The Board of Education can no more plead not guilty than could the Police Commissioner if he allowed patrolmen to choose not to accept dangerous or unpleasant assignments. . . . Yet, in effect, that is all the Board . . . has done so far, in limiting the exercise of its power of assignment to the assignment of newly appointed teachers to the [minority] schools.

180 N.Y.S.2d at 871, 872. Judge Polier suggested possible measures the Board could take to alleviate the assignment disparity: compulsory assignment of veteran teachers to minority schools for a given number of years; financial incentives to induce teachers to volunteer for difficult schools; and added services and facilities at those schools to make them more attractive places to teach. *Id.*

Toward Greater Opportunity: A Progress Report from the Superintendent of Schools to The Board of Education Dealing With Implementation of Recommendations of the Commission on Integration (June, 1960) (Def.Bd.Ex. 31), indicates some of the steps taken by the Board to remedy the pattern of unequal allocation of teacher resources identified by the Commission on Integration (and Judge Polier's opinion). The report points out that surveys of elementary schools, for example, had found inequalities in the proportion of licensed teachers serving in "special service" (normally, heavily minority) and regular schools. *Id.* at 102–08. It pointed out that as of 1958, the Board had established an experience index (the ratio of regularly appointed positions to total actual positions); using this index "no appointments, transfers, or assignments of regular teachers were made to schools whose percentage of regularly appointed teachers equaled or exceeded" the citywide ratio. *Id.* at 104. After one year's experience with this index, some progress was realized in equalization of the proportion of regularly appointed versus other teachers. *Id.* But this limited progress towards equalization, while addressing the regular teacher vs. substitute teacher inequality, did not address the broader problem indicated in the Commission report—that the minority schools were staffed by many more inexperienced teachers, even among the regular teachers. The progress report indicates that Commission recommendations to alleviate this disparity—such as excessing, transfer, initial service of newly appointed teachers in nonminority schools—had not been implemented. Rather, the Board had elected to defer such measures until "other possibilities ha[d] been tried

and found wanting." *Id.* at 109. The report does indicate the severe problems facing the Board in its efforts, including a continuing and increasing shortage of licensed teachers to fill ever-expanding vacancies and a high teacher declination rate for appointments to special service schools. *See id.* at 104–06. Finally, with respect to the Board of Examiners, the report concludes that there was no indication of an excessive time period between examination and appointment, and that the Board of Examiners made a "constant effort . . to reexamine and reevaluate its procedures and its techniques." *Id.* at 113–14.

In September, 1963, the Superintendent of Schools issued a "Plan for Integration in New York City Schools" (Def.Bd.Ex.26). It "propose[d] to embark on a new series of endeavors" to "hasten the day when our city is completely integrated and all . . children will enjoy equal educational opportunity." *Id.* at 1275. Included among the measures called for were "[r]ecruitment of more Negro and Puerto Rican teachers [and] [i]ntensified efforts to attract minority group candidates, both within the City and outside"; "Effort to increase the number of Negro and Puerto Rican Supervisors", *see id.* at 1276; and "[a]dministrative devices to improve and equalize quality of teachers in all schools." *Id.* at 1280. The report suggested a "census of teachers, in order to determine the over-all distribution of ethnic groups." *Id.* No other specifics in these areas were outlined. The Board approved these proposals. *See id.* at 1282.

In interim reports, Progress Toward Integration (September 1—November 30, 1963) and Plans for the Immediate Future (December, 1963) (Def.Bd.Ex. 25), the Superintendent outlined the continued need, despite evidence of improvement, for recruitment of more minority teachers. The report indicates that the Board had begun to take steps to recruit such teachers outside the New York City metropolitan area, particularly in Southern colleges. On this front, it was concluded, "[i]t is evident that efforts should be continued and expanded to secure a greater number of Negro and Puerto Rican teachers and supervisors, and

to distribute them within the school system for better integration." *See* Def.Bd.Ex. 25 at 14–15. The Board's Personnel Division was directed to "give added attention to the recruitment . . . and distribution of Negro teachers and supervisors." *Id.* at 26.

Again, in a Statement of Policy—Excellence for the Schools of New York City (April 28, 1965) (Def.Bd.Ex. 28), the Board recognized the continuing need for additional action to equalize teacher resources:

> In order to insure excellence of instruction in all schools, the talents of the staff must be spread so as to reach all schools. This requires a procedure for guaranteeing a fair share of experience and competence in every school. Since voluntary movement of the staff has not resulted in such equitable distribution, the Superintendent has been directed to prepare a plan for the assignment of experienced teachers to be put into effect in September 1966. This might well be patterned on the use of the appointment index as a basis for assignment to schools in order of need.

Def.Bd.Ex. 28 (mimeo.) at p. 5. In an accompanying report, Implementation of Board Policy on Excellence for the City's Schools (April 28, 1965) (Def.Bd.Ex. 29), the Superintendent outlined steps to be taken to implement this renewed directive: requesting the Personnel Division to develop a plan "for the assignment of experienced teachers and supervisors to all the schools of the city to assure equality of instructional and supervisory experience and competency for all children," with "the procedures to be used in this assignment but not the right of assignment . . . subject to negotiation with the teachers' representatives," Def.Bd.Ex. 29 at pp. 12–13; appointment of elementary school teachers from eligible lists in "equitable fashion to all schools regardless of standing on lists," *id.* at 13; and directing the Personnel Division to "devise procedures which will improve the integration of the staffs of all schools . . . ." *Id.*

A census of the racial distribution of teachers was apparently undertaken in 1966. The report found a substantially disproportionate distribution of black teachers:

> A summary of school positions, exclusive of school secretaries [indicates that] [t]here is marked variation in the proportion of Negro personnel serving in both regular and substitute positions from district to district. Thus, in Districts 20 and 21, fewer than one percent of the teachers assigned as regulars are Negroes; in Districts 4 and 6, more than 20 percent of the regular teachers are Negroes. When persons serving in acting capacities are studied, much the same situation holds true. In some districts, none of the individuals who are assigned in an acting capacity are Negroes; in others, the proportion of Negroes so assigned exceeds 25 percent.

Def.Govt.Ex. 149 at 3. The report on the census concluded with the following recommendations to improve the racially disparate teacher distribution:

> Analysis of the ethnic data by district indicates wide variations in the distribution of Negro teachers among the districts . . . . It is evident that much remains to be done if a satisfactory staff ethnic balance is to be achieved. It is recognized that there are legal, contractual and other restrictions which make it difficult to effect change. Nevertheless the present situation is far from satisfactory and must be improved. The following recommendations are therefore made: The Board of Education policy with reference to staff integration should be made clear to all school officials and made a part of all appropriate training activities. Administrative action should be taken in order to secure improved staff integration. When necessary, the United Federation of Teachers and the Council of Supervisory Associations should be consulted, and agreement obtained if required. There should be a constant review of the practice of assignment of student teachers so as to insure promotion of integration and improvement of staffing of the schools heavily populated by disadvantaged children.
>
> Voluntary plans to improve staff integration, consistent with the merit system, should be encouraged. The merit system effectively administered is a prime protection for all applicants for teaching and supervisory positions. Staff ethnic census should be taken biennially as a basis for evaluation of action taken and as a guide to further improvement.

*Id.* at 8–9.

But, as far as can be determined from the record, no steps which would have involved compulsory transfer of teachers either to improve experiential or racial distribution were ever implemented. The Board did, however, implement a policy—use of the "experience index"—to equalize the ratio of regularly licensed to substitute personnel at least in the elementary schools. As the Deputy Director of the Board's Office of Personnel testified:

> The question of voluntary transfers that was mentioned was implemented. . . . As far as forcing experienced teachers, I do not think that was ever implemented. I'm sure it was never implemented.
>
> Q. The school experience index . . . would never be able to effect an equitable distribution of teachers on the ground of experience [in] minority schools because those schools were constantly losing teachers?
>
> A. If the teachers did stay—the concept was, if you put them in and they stayed, you are hitting those schools, but I agree with you that there was attrition and that wouldn't solve the problem.

Tr. at 1572–73.

During the mid-1960's, in addition to utilizing the experience index in assigning new teachers to some schools, the Board also negotiated with the United Federation of Teachers a contractual transfer plan designed to stabilize the work force and confront the problem of high teacher turnover in "difficult" schools and districts. Under this contractual plan—which is still in full effect, *see* Pl.-Int. UFT Ex. 102—if a school

is below the city-wide index for teacher experience level, there is an absolute limit on the number of experienced teachers (more than five years of service) who may transfer out of that school, but there is no limit on the number of teachers with more than five year's experience who may transfer in. Conversely, where the experience index is above the city-wide average, there is a limit on the number of teachers who may transfer into the school, but no limit on the number of transfers out of the school to a school with a lower experience index. *See id.* at pp. 64–66. The plan has apparently had a positive effect, greatly limiting the number of experienced teachers transferring out of difficult schools. *See* Tr. at 96–98, 141–43, 1537–41, 1717. The UFT and the Board's Office of Personnel have also engaged in continuous efforts to convince newly appointed teachers to accept assignment to "difficult to staff" schools. *See* Tr. at 496–97.

In 1969, when the New York State Legislature began considering drastic reorganization of the City school system through decentralization, the Board's proposed decentralization plan called for a complete overhaul of the method of hiring teachers. It would have permitted the City the flexible hiring approach authorized in the majority of school districts in the state, and abolish the mandated competitive, ranked examination procedure of the Board of Examiners. Plan for the Development of a Community School District for the City of New York 16–17 (January 29, 1969) (Def.Bd.Ex. 23). *See also* Def.Bd.Ex. 22 (proposed legislation implementing Board's decentralization plan). Among other things, the Board criticized the competitive examination process as ignoring the reality that the initial years of teaching are "essentially training years for which [a general] examination for appointment . . . but not a competitive examination, is appropriate." Def.Ex. 23 at p. 18. After this training period, the Board viewed "examination for a tenured teaching appointment by a probationary teacher's principal . . . [or] any other relevant member of his supervisory staff . . . superior to any traditional competitive ex-

amination." *Id.* But as pointed out in Section IV(A)(1)(b), *supra*, the Legislature largely ignored the Board's recommendations in this area; except for the "alternate" hiring method approved for 45% schools, the competitive examination system was left largely intact.

Extensive public hearings regarding the Board's teacher hiring practices were held in 1971 by the New York City Commission on Human Rights. *See* Trachtenberg, Selection of Teachers and Supervisors in Urban School Systems: A Transcript of Public Hearings Held Before the New York City Commission on Human Rights (1972) (Def.-Int. Ross' Ex. 107); *see also* Affidavit of Prof. Paul Trachtenberg (Def.-Int. Ross' Ex. 121). The Commission concluded that the Board of Examiners and its competitive licensing system should be abolished; this was "crucial if a narrow concept of merit, based largely on written proficiency tests of questionable validity, is to be replaced by a more realistic appraisal of merit." Def.-Int. Ross' Ex. 107 at 722. It criticized the system in six principal areas: first, it was " antiquated, outmoded, and inconsistent with both contemporary educational requirements and the concept of decentralized schools," *id.* at 712 (quoting testimony of then-Chancellor Harvey B. Scribner); second, it caused delay in appointments— causing the City to lose qualified applicants to other systems—and deterred many (particularly minorities) from applying, *see id.*; third, it caused rigidity—its "emphasis on formalistic training, formalistic requirements, long periods of service" partially explained the system's low percentage of minority professionals, *id.* (quoting testimony of then-Board President Murray Bergtraum); fourth, the system had a high dollar cost, and created many patronage jobs, *id.* at 712–13; fifth, there was strong evidence of test invalidity and bias, *id.*, at 713–15; and sixth, it was inconsistent with meaningful decentralization, since it foreclosed local school boards, in most instances, from having flexibility in hiring decisions, *id.* at 715. In summary, the Commission declared:

The current Examiners' system is costly, cumbersome, and regardless of intent, restricts the opportunities available to many who might contribute ably to the education of this city's school children, especially inner-city children. Such professionals and aspirants include members of minority groups and, as the testimony revealed, many others as well. . . .

The New York City school system—like virtually all other school districts in New York State and the rest of the country—should rely on state certification for initial screening of professional staff. Community boards should have the ultimate responsibility for the second and crucial stage in the employment process—actual selection of staff based upon sound and objective selection criteria and procedures geared to the needs of individual boards.

*Id.* at 722–23. *See also* Tr. at 510, 536, 543–45 (testimony of Dr. Frank Arricale, former Board Director of Personnel) (indicating he had consistently urged reform of Board of Examiners system, primarily on ground that it served as a serious impediment to recruiting teachers, particular minorities).

In sum, dating back to 1951, virtually every commission, agency and consultant firm that has reviewed the Board of Examiners system has called either for its substantial reform or abolition. *See* Def.-Int. Ross' Ex. 123 at ¶¶ 3–5 (supp. affidavit of Prof. Paul Trachtenberg). A chief reason for this criticism has been that the system tended to discourage minority teachers from applying and to screen them out.

Finally, certain aspects of the Board of Examiners system have been the subject of extensive litigation under the federal civil rights laws. In *Chance v. Board of Examiners*, 330 F.Supp. 203 (S.D.N.Y.1971), aff'd, 458 F.2d 1167 (2d Cir. 1972) (preliminary injunction upheld); 496 F.2d 820 (2d Cir. 1974) (affirming modification of relief); 534 F.2d 993 (2d Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (reversal of related relief); 561 F.2d 1079 (2d Cir. 1977) (opinion on modification of consent judgment), black and hispanic plaintiffs secured preliminary injunctive relief, and eventually obtained a consent judgment, with regard to their claims that the system as it related to supervisory appointments was racially discriminatory and not job-related. The relief in *Chance* worked major changes in the procedures for hiring and appointing school supervisors.

Similarly, minority plaintiffs are currently pressing, on Title VII grounds, a challenge to the Board of Examiners system as it relates to teacher hiring. *See Rubinos v. Board of Examiners*, No. 74 C 2240 (S.D.N.Y.). While preliminary injunctive relief has apparently been denied in that case, plaintiffs have secured a preliminary determination that the testing process has a sufficient discriminatory impact to justify hearings on the job-relatedness issues. *See* Def.-Int. Ross' Ex. 42 (transcript of *Rubinos* hearing, February 15, 1977); *see also* Def.Bd.Ex. 42 (full transcript of Rubinos testimony).

### 3. Board Procedures for Assigning Teachers

The Board's policies and practices for assigning teachers from eligible lists to schools and local districts have varied considerably over the period 1961 to date. Perhaps the most dramatic change has come about as a result of the system's decentralization in 1969. But changes have also been made in response, at least in part, to the problems and inequalities perceived by the Board, and others, in the system over the years. In addition, the Board has been forced to react to such phenomena as periods of severe teacher shortage (both in general, and in specific license areas); periods of budgetary crisis and declining student population; and problems of teacher attrition and high rate of declination for certain types of teaching assignments. In formulating and implementing its policies, the Board has doubtless often walked a tightrope over a roiling sea of conflicting interests. Moreover, to a great extent, it has doubtless seen itself as severely confined by the competitive examination system and its attendant requirements as mandated by state law. In order to grapple with this appointment-assignment problem,

a partial exploratory descent into the convoluted bureaucratic complexities of the system is necessary.

a. Procedures Prior to Decentralization

1. Elementary Schools

During the period from September, 1961 to shortly prior to the effective date of the 1969 decentralization law, appointments to elementary schools were made largely on the basis of three mechanisms: the citywide and school personnel indices (CPI and SPI); the "double preference" procedure; and the borough of teacher residence. Over this period, of course, there were some technical and minor changes in Board procedure, and there were also doubtless ways in which individual schools desiring appointment of particular individuals could evade the formal requirements. See Tr. at 1546–47 (Board's deputy director of personnel testifies that there were individual compliance problems). Board policy during this era was designed to equalize the ratio of regularly appointed to substitute and other teachers across the system, and to provide for staff stability by appointing additional regular teachers to needy schools. See Def. Bd.Ex. 1 at 2.

First, under the "double preference" procedure, where a teacher was serving as a regular substitute or student teacher in a special service school (Title I), pair (integration plan) school, or was to be assigned to teach handicapped students, and the school principal requested the regular appointment of that teacher when he or she appeared on the eligible list, the teacher could be appointed to remain in the school. See Def. Bd.Ex. 3, ¶ 6; Def.Bd.Ex. 7, § (B)(1)–(2). At some points during this period, all principals were also permitted to request appointment as regular teachers of eligibles who served as substitutes in their schools. Compare Def.Bd.Ex. 8, § (A)(1) (circular of October, 1966), with Def.Bd.Ex. 5 (circular of December, 1974) (no such appointments permissible). In addition, eligibles could request appointment to special service schools; if also requested by the school principal, they would receive an appointment. See Def.Bd.Ex. 3 (appointment procedure) (indicating that this rule was applicable at least during 1963–65). While these procedures were operative, schools could receive appointments under them regardless of the effect of the personnel index system described below.

Second, after "double preference" appointments, all further appointments from eligible lists were largely governed by the citywide personnel index. The CPI was the ratio of regularly (licensed) appointed teachers actively serving in the system to total authorized positions in the system. For each school, a school personnel index was calculated—the ratio of regularly appointed teachers in the school to authorized positions. According to the Board, any school having a SPI over the CPI did not receive new appointments of regularly licensed teachers or transfers of such teachers; rather, such appointments were made only to schools with SPI's below the CPI, with special attention to schools with SPI's considerably below the CPI. See Def. Bd.Ex. 1 (summary of hiring history); Def. Bd.Exs. 2–5 (appointment policy circulars).

Third, the available vacancies, as determined by use of the SPI and CPI, were filled initially on a borough basis. Under this system, eligibles living in a borough were assigned to schools within their borough, at least until there were no further vacancies in that borough; the Board would determine the "cut-off" score on the eligible lists by looking at the number of eligibles from and vacancies within each borough. Those below the cut-off score would be assigned to vacancies in other boroughs. Within each borough, the Board utilized a ratio procedure to allot eligibles between special service and regular schools; the details of this procedure varied a bit over the years. At some points, the Board applied the rule that four of every five appointments were to special service schools. At other points, the Board would look to the ratio of vacancies under the CPI/SPI between special service schools and regular schools; appointments going down the eligible list were then made in line with that ratio. See Def.Bd.Ex. 1; Def.Bd.Ex. 3,

¶¶ 10–12; Def.Bd.Ex. 7, § (B)(3); Def. Bd.Ex. 8, § (B); Tr. at 1493–94. One problem with this effort at equalization was that all appointment notices were sent out at the same time; thus, if eligibles declined appointments to special service schools at a higher rate than appointments to regular schools, the theoretical ratio would not be obtained in practice.

2. Junior High and High Schools

Junior high schools and high schools were staffed on a different basis from elementary schools. For these schools, assignments had to be made from eligible lists for specific subjects to correspond to vacancies in specific subject areas. Here, the Board asserts that there were severe shortages of eligible teachers, so that use of the personnel index or ratio appointment system was not practicable.

Instead, the Board basically filled vacancies with eligibles whenever they were available, again matching assignments to the borough of the eligible's residence. School principals were permitted to request specific eligibles for assignment to their schools, especially where the eligible was a substitute or student teacher in that school. The Board attempted to distribute available eligibles to schools with the greatest number of vacancies, but "geographic location of the school in relation to the eligible's home was always the major factor in appointment." Def.Bd.Ex. 1 at 2. According to the Board, all teachers on eligible lists were reached for appointment during this period; the shortage was so critical that the Board regularly had to appoint substitutes to fill vacancies. See Def.Bd.Ex. 1 at 2; Tr. at 1496–97.

b. Procedures During Interim Period

From September, 1968 to the effective date of the 1969 decentralization law, some significant interim changes in appointment procedures were made. Most critically, the Board no longer made appointments directly to elementary and junior high schools; rather, the new focus was on the district: the Board appointed teachers to each district, which then was responsible for filling vacancies in its schools.

The double preference procedure was still in effect. Regular substitutes or student teachers in special service schools (now including junior high schools), could, if eligible, be appointed to their schools without regard to the index. Eligibles, on request, could also be appointed to any special service school. Eligible substitutes in regular schools could be appointed to their schools if they were below the CPI.

The special assignment ratio for appointment was no longer used. District needs were calculated to determine the number of regular teachers needed to bring its schools up to the CPI; and teachers were assigned to each district in proportion to that district's needs. The district was then expected to assign the referred teachers to its schools on the basis of the index. As before, eligibles were sent to available openings in their borough of residence until no vacancies remained. See Def.Bd.Ex. 9.

For the high schools, the procedure remained unchanged.

c. Procedure Following Decentralization

1. Elementary and Junior High Schools

Following enactment of the decentralization law, elementary and junior high schools were under the primary jurisdiction of the community school districts. The law provided, in part:

Each community school board shall appoint teachers for all schools . . . under its jurisdiction who are assigned to the district by the chancellor from competitive eligible lists. Insofar as practicable the chancellor, when making such assignments shall give effect to the requests for assignment of specific persons by the community board. The community board shall appoint such teachers to schools within such district[s] . . . ..

N.Y.Educ.Law § 2590–j(4)(c). Thus, the Board was responsible for "assigning" eligibles from lists to the district, which would assign to the schools.

Under this law, the CPI and ratio system could not, the Board asserts, be used. Rather, the Board followed the procedure of transmitting to all community boards lists of all eligible teachers needed to fill

existing vacancies across the school system. The community boards would then select those teachers it wanted to appoint, obtain their consent, and notify the Board. So long as a teacher was reached on the eligible list, these requests would be honored. See Def.Bd.Ex. 1 at 5; Def.Bd.Exs. 13, 14. Community boards were urged by the Board not to use substitutes to fill long-term vacancies, but rather to appoint eligible regular teachers waiting on the lists. See Def.Bd.Ex. 14, ¶ 4. Districts could, where they contained 45% schools, also use the alternate appointment method authorized by the 1969 law, see Section IV(A)(1)(b), supra; this method, however, was only available for appointments in September, see N.Y.Educ.Law § 2590–j(5)(c), Tr. at 1511–12.

> The alternative method is used only for elementary and junior high schools. . . Districts may appoint [under it] in September—that is very important—districts may appoint in September persons nominated by . . . the previous May, either out of order from the rank . . or people who have a sufficient national teachers examination score. But the alternative method of hiring—the reason it's so small it can only be run [in September]. New York City has this very strange situation that at least sixty percent of the appointments are made after October because people retire not in September and in June but . . . throughout the year. You have the situation that although you have the law for about seven or eight years, you have very small numbers of people hired through the alternative method.

Tr. at 490 (testimony of Dr. Arricale, former Board Director of Personnel).

The Legislature during this period also provided for exception to the standard rank order appointment method to benefit substitutes who had passed examinations placing them on regular eligible lists. In 1972, N.Y.Educ.Law § 2590–j was modified to provide that where a substitute had been in continuous service in the system since 1970, and a vacancy existed in the school where the substitute was serving as of September, 1972, that substitute was to be appointed regardless of his or her rank on the eligibility list. N.Y.Educ.Law § 2590–j(6–a)(a). The Board supported this legislation and it may have favored minority teachers. See Tr. at 1507–09; Def.Bd.Ex. 1 at 6. The Board had also supported periodic legislative enactments authorizing "closed examinations" for substitute teachers: substitutes were able to take performance observation examinations and receive regular licenses without undergoing the normal Board of Examiners process; they were then eligible for appointment. These provisions were designed to stabilize the teaching force; they also aided minority teachers to secure regular appointments. See Def. Bd.Ex. 1 at 6; Tr. at 1507–09.

Finally, the Board supported legislation which counted time served as a paraprofessional in computation of a teacher's seniority, and which gave preference to teachers on eligible lists who had served as substitutes for any two terms between 1973 and 1976. This legislation "definitely [was] designed to benefit minorities," see Def. Bd.Ex. 1 at 6, Tr. at 1507–09, since, for example, it gave former paraprofessionals who were teachers (disproportionately minority) added seniority and thus added protection against layoffs, and also gave substitutes (who as a group were probably a higher percentage minority than in the regular teaching staff) a quicker crack at existing vacancies. See Def.Bd.Ex. 1 at 7.

During the period 1972–1976, the school system experienced a reduction in pupil enrollment and, at some points, a budget crisis. These factors had a marked effect on hiring and appointments, and they tended to favor those with maximum tenure, primarily nonminority teachers:

> Beginning in 1972, there was a large reduction in the number of [elementary school] appointments due to the decline of pupil population. The majority of appointments to the elementary schools for [1972–1975] were made through the Alternate Teacher Selection Method. The Legislature, realizing the budget difficulties, actually passed bills to extend eligible lists which could not be reached prior to their statutory expiration date of four years.

In late 1972, district and high school budgets contracted due to decline in pupil population. Large scale excessing of teachers occurred in declining districts . . . . It was necessary to transfer hundreds of teachers throughout the city from declining districts to districts which still had available positions. Appointments diminished greatly during this period. . . . This decline in pupil population continued and eventually resulted in the need for city-wide layoffs [and was] compounded by the additional problem of budget cuts required by New York City. For the school years 1975 and 1976, over 15,000 teachers and supportive staff were laid-off and placed on preferred lists. Despite the onset of layoffs, there were still vacancies in specific license areas . . . where there had always been a need for teachers. Laid-off teachers were offered opportunities for reemployment through recertification [taking Board of Examiners tests in the needed license areas]. Therefore, almost all personnel assigned to positions which opened during 1975 and 1976 were those teachers who had been laid-off and subsequently restored to their original licenses or recertified to teach in another area. The appointments [of new teachers] that were made during this time were in subject areas where no laid-off personnel were qualified and available. With the easing of the budget crisis in September, 1977, the major recall of laid-off staff began.

Def.Bd.Ex. 1 at 7; *see also* Tr. at 1513–25.

### 2. High Schools

For the high schools, assignment procedures remained basically unchanged. As indicated in Section IV(A)(3)(c)(1), *supra*, the Board continued to have substantial problems in filling vacancies in specific subject areas.

d. The Problem of Assignment Declination Following the Budget Crisis

When the *major recall of laid-off staff* began in 1977, the Board experienced severe problems due to the large numbers of recalled teachers who declined new assign-

ments. Declinations were due to several factors—including the fact that many teachers had probably secured employment elsewhere during the period of their lay-off—but a major factor, as previously, was teacher reluctance to work in difficult to staff schools.

In August, 1977, all laid-off personnel available for restoration to service were required to report in person to declare their interest in serving in our schools . . . . This procedure was used to ensure that the schools would be properly staffed. During the budget crisis the experience of the Division of Personnel was that many teachers were traumatized by the layoffs, and, fearful of returning, did not report for service when assignments were made. There were massive declinations of assignments during this period even though it meant that those persons declining assignments would not be considered further for appointments to the school system. The only valid reasons for declination . . were extreme travel hardship, contracts with other systems, maternity and child care, severe health problems, or current enrollment in graduate school for meeting license requirements.

Def.Bd.Ex. 1 at 7. *See also* Tr. at 1607–1621 (testimony of Ms. DeCanio) (problem of declinations over years; in some respects, consequences of declination not severe enough, since declining teachers could often still teach in system).

### 4. Demographic Changes in Student Population

In 1957, the student population of the New York City school system was 68.3% non-minority. Even at that time, due primarily to housing patterns, many of the system's schools were de facto segregated. *See, e. g., In the Matter of Skipworth,* 14 Misc.2d 325, 180 N.Y.S.2d 852, 863–64 (Dom. Rel.Ct.1958) (noting de facto segregation of system's junior high schools; of 127 junior high schools in system, 52 had minority enrollment of less than 15% and 16 had minority enrollment of more than 85%).

From at least 1968 to the present, the school population has become increasingly

minority. (Despite its inappropriateness under present New York City school system conditions, we continue to use the term "minority" to refer to blacks and hispanics and "non-minority" to refer to whites.) For example, in 1976 the minority student population was 67.7%; in elementary schools it was 69.7%, in junior high and intermediate schools 70.1%, in high schools 62.6%. Since 1968, the minority student population has increased from 56.1% to its 1976 level of 67.7%. See Def.Govt.Ex. 49 at App. A. In 1974–75, 45.3% of all schools had minority populations in excess of 90%; 53.7% of all schools had minority population in excess of 75%. See Def.Int. Ross' Ex. 106 at 67–69 (Gifford Report). There has been no reversal of this tide.

Housing patterns in virtually all boroughs of New York City reflect such large concentrations of either minority or non-minority groups that zoning of school feeder patterns to achieve racial balance became increasingly difficult during the 1960's and 1970's. In an effort to improve racial balance, the Board devised various zoning strategies, such as choice of admissions, paired schools, and close scrutiny of school site selection. See, e. g., Parent Association of Andrew Jackson High School v. Ambach, 451 F.Supp. 1056 (E.D.N.Y.1978), rev'd on other grounds, 598 F.2d 705 (2d Cir. 1979).

Nevertheless, it is apparent that the schools have become more—rather than less—segregated over the years and that this trend is likely to continue unabated. Id.

B. OCR's Charges and Evidence

1. OCR's allegation that the Board has "denied minority teachers full access to employment opportunity through the use of racially discriminatory selection and testing procedures and through the use of racially identifiable employment pools in a manner that discriminatorily restricts the placement of minority teachers"

a. "racially identifiable employment pools"

Under this heading, OCR indicated that its suspicions had first been aroused by the fact that, despite the heavily minority population of the school system's student body, the percentage of minority teachers had never exceeded 15%. Table 1 (drawn from Def.Govt.Ex. 49, App. A) confirms this observation. A comparison with similar figures for other large urban school districts, which showed a far closer approximation between percent of minority students and teachers, further aroused OCR's concern. Table 2 (drawn from Def.Govt.Ex. 45, App. C) presents this data.

TABLE 1: Racial and Ethnic Breakdown of New York City School System Pupils and Staff, 1968–76

Profile: New York City Schools

Full-Time Teachers (Excluding District 75)

| | Total | Black | | Spanish Surnamed | | Oriental | | Native American | | Total Minority | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1968–69 | 51,832 | 4,079 | 7.9% | 464 | 0.9% | 137 | 0.3% | 46 | 0.1% | 4,726 | 9.1% | 47,106 | 90.9% |
| 1970–71 | 58,827 | 4,455 | 7.5% | 798 | 1.4% | 209 | 0.4% | 10 | 0.0% | 5,472 | 9.3% | 53,355 | 90.7% |
| 1971–72 | 54,889 | 4,426 | 8.1% | 1,027 | 1.9% | 214 | 0.4% | 13 | 0.0% | 5,680 | 10.3% | 49,209 | 89.7% |
| 1972–73 | 53,924 | 4,610 | 8.5% | 1,154 | 2.1% | 217 | 0.4% | 12 | 0.0% | 5,993 | 11.1% | 47,931 | 88.9% |
| 1973–74 | 54,726 | 4,746 | 8.7% | 1,376 | 2.5% | 288 | 0.5% | 8 | 0.0% | 6,418 | 11.7% | 48,308 | 88.3% |
| 1974–75 | 53,907 | 5,038 | 9.3% | 1,688 | 3.1% | 295 | 0.5% | 10 | 0.0% | 7,031 | 13.0% | 46,876 | 87.0% |
| 1975–76 | 46,539 | 4,231 | 9.1% | 1,678 | 3.6% | 233 | 0.5% | 8 | 0.0% | 6,150 | 13.2% | 40,389 | 86.8% |

Students (Excluding District 75)

| | Total | Black | | Spanish Surnamed | | Oriental | | Native American | | Total Minority | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1968–69 | 1,063,587 | 334,641 | 31.5% | 244,302 | 23.0% | 15,753 | 1.5% | 1,526 | 0.1% | 596,222 | 56.1% | 467,365 | 43.9% |
| 1970–71 | 1,140,359 | 393,516 | 34.5% | 292,664 | 25.7% | 17,115 | 1.5% | 607 | 0.1% | 703,902 | 61.7% | 436,457 | 38.3% |
| 1971–72 | 1,137,707 | 397,287 | 34.9% | 301,380 | 26.5% | 18,267 | 1.6% | 308 | 0.0% | 717,242 | 63.0% | 420,465 | 37.0% |
| 1972–73 | 1,113,601 | 399,804 | 35.9% | 293,745 | 26.4% | 20,146 | 1.8% | 415 | 0.0% | 714,110 | 64.1% | 399,491 | 35.9% |
| 1973–74 | 1,096,702 | 400,010 | 36.5% | 296,589 | 27.0% | 22,021 | 2.0% | 613 | 0.1% | 719,233 | 65.6% | 377,469 | 34.4% |
| 1974–75 | 1,094,609 | 398,572 | 36.4% | 302,552 | 27.6% | 23,088 | 2.1% | 585 | 0.1% | 724,797 | 66.2% | 369,812 | 33.8% |
| 1975–76 | 1,085,550 | 401,652 | 37.0% | 308,551 | 28.4% | 24,231 | 2.2% | 727 | 0.1% | 735,161 | 67.7% | 350,389 | 32.3% |

TABLE 2: Comparison of Racial/Ethnic Composition of Student Body and Staff, Five Large Urban School Systems, 1975–1976

| School District | Total number | % | Minority number | % | Non-Minority number | % |
|---|---|---|---|---|---|---|
| New York City | | | | | | |
| Students | 1,100,224 | 100.0 | 734,737 | 66.8 | 365,487 | 33.2 |
| Teachers | 55,415 | 100.0 | 7,316 | 13.2 | 48,099 | 86.8 |
| Los Angeles | | | | | | |
| Students | 603,656 | 100.0 | 350,817 | 58.1 | 252,839 | 41.9 |
| Teachers | 24,558 | 100.0 | 7,648 | 31.1 | 16,910 | 68.9 |
| Chicago | | | | | | |
| Students | 536,657 | 100.0 | 385,367 | 71.8 | 151,290 | 28.2 |
| Teachers | 23,508 | 100.0 | 10,154 | 43.2 | 13,352 | 56.8 |
| Philadelphia | | | | | | |
| Students | 266,500 | 100.0 | 178,020 | 66.8 | 88,480 | 33.2 |
| Teachers | 13,251 | 100.0 | 5,324 | 40.2 | 7,927 | 59.8 |
| Detroit | | | | | | |
| Students | 257,396 | 100.0 | 189,563 | 73.6 | 67,833 | 26.4 |
| Teachers | 9,669 | 100.0 | 4,894 | 50.6 | 4,775 | 49.4 |

After further investigation, OCR concluded, first, that New York City had organized its teacher hiring pools into two racially identifiable components: the regular rank order component (used in high schools, and all other schools not 45% schools), and the alternate component (used in 45% schools), see Section IV(A)(1)(b), supra (description of two-track hiring system). Comparing teachers hired by the NTE route of the alternate method and teachers eligible to be hired under the rank order method, OCR found that minority teachers were represented in the former at a percentage substantially greater than in the latter. Assuming that the system could not rationally permit nonqualified teachers to be hired under either method, see Tr. at 650–51, OCR concluded that the system excluded a large number of potential minority teachers (those eligible under the alternate method) from initially teaching in a large number of the system's schools, in addition to resulting in two racially identifiable employment pools. Table 3 presents some of the data supporting these conclusions for one year, and reports results of a "Z score" test for statistical significance showing that the racial disparity of the pools was, in all cases but one, statistically highly significant. See discussion, infra, of statistical significance of Z score. Data on this issue for

appointments for the 1978 school year, *see* Def.Govt.Ex. 45 at p. 111, shows that the racial identifiability of the pools has not markedly changed. *See also* Def.Bd.Ex. 36, Attachments F and G.

TABLE 3: Hires Via NTE Method Compared to the Pool of Eligibles on the Rank Order List

[Source: Def. Govt. Ex. 45 at p. 109]

| School Year and Category | NTE Hires | | | On Rank Order List | | | Comparison of Proportions [a] |
|---|---|---|---|---|---|---|---|
| | Number Black | Number White | Blacks as Percent of Total | Number Black | Number White | Blacks as Percent of Total | |
| **1973–74** | | | | | | | |
| Common Branches ......... | 193 | 321 | 37.55 | 272 | 2,955 | 8.43 | 13.29 |
| Early Childhood ........ | 14 | 16 | 46.67 | 84 | 774 | 9.79 | 4.02 |
| English, JHS ............. | 22 | 25 | 46.81 | 42 | 354 | 10.61 | 4.86 |
| Social Studies, JHS ............. | 21 | 63 | 25.00 | 35 | 492 | 6.64 | 3.79 |
| Math, JHS ......... | 5 | 15 | 25.00 | 62 | 730 | 7.83 | 1.77 [b] |

[a] Z–score with unpooled variance.

[b] This result is *not* significant at the .05 level with a two-tail test.

There are problems with the data. The NTE hires represent actual appointments under only one prong of the alternate method, while the rank order list figures represent those actually on lists, not those actually appointed, and include persons who would be eligible for hire under the "out of rank order" prong of the alternate method. Data on the racial composition of those hired off rank order lists under the alternate method, and on those actually hired under the regular method, was not available. The 1978 data discussed above did supply racial composition figures for NTE and rank order list appointments, but did not provide separate minority-majority figures for appointments off rank order lists via the regular and alternate methods. However, the differences reflected in the available data are large enough so that there is no reason to believe that a more finely tuned comparison would indicate a substantially different result.

Further support for the observation that the alternate hiring method appoints a far higher percentage of minority teachers comes from the Gifford Report, Def.-Int. Ross' Ex. 106 at pp. 27–28, which states that for the period 1971–1975, 1,024 of the 2,561 teachers hired from the NTE track were minority, and that while specific data for the out of rank order portion of the alternate method was not available, "indications are . . . that of the 5,159 'out of rank order' teachers hired since 1971–72 . . . the percentage of minority group appointments is at least equal to, and may actually exceed, the percentage of minority group NTE appointments." *See also id.* at 26 ("It is ironic that a measure aimed at improving the racial/ethnic composition of . . . staff has, in fact, resulted in the creation of the racially identifiable employment pools being challenged by OCR.").

In addition, OCR noted that those teachers in the alternate hiring pool were restricted in appointment largely to 45% schools, which themselves were highly racially identifiable. Since 1971, the student population in the 45% schools has been overwhelming minority, exceeding, across all schools, 90%. *See* Def.Govt.Ex. 49 (App. E). Thus, OCR concluded, to the extent teachers eligible under the alternate method are disproportionately minority, the likelihood is that they will be channeled to schools with high concentrations of minority students. Table 4 presents this schematically:

Table 4: Effect of Current New York City Teacher Hiring Methods 1971-75

---

Def.Govt.Ex. 49E (courtroom chart). *See also* Def.Govt.Ex. 45 at pp. 111–12 (student population of 45% schools "significantly" blacker than non-45% schools). *Cf.* Def.-Int. Ross' Ex. 118 (while teachers hired under alternate method may subsequently be eligible to teach in all schools, data shows that vast majority have remained in 45% schools).

For purposes of this litigation, it is important to note that OCR did not seek to assert or challenge the statutory or constitutional validity of those provisions of New York law, *see* N.Y.Educ.Law § 2590–j(5), authorizing the alternate hiring mechanism. The agreement at issue here contains no measures that draw into question, or that would require alteration of, the alternate system, with the possible exception of the provision calling for validation of tests used in determining eligible teachers (which could be read to require validation of the NTE examination and which requires validation of Board of Examiners tests from which the alternate method's "out of rank order" hires are drawn), and the provisions for eliminating rank ordering and dating (which would vitiate the distinction between the "out of rank order" prong of the alternate method and the regular method). Thus, the OCR findings as to dual employment pools are directly relevant here only insofar as they relate to its conclusions that the regular hiring method required substantial overhaul, to the effect the entire hiring mechanism has on students and on the assignment of teachers within the system, and to the overall reasonableness of the Board's entering into the agreement and the remedial measures themselves.

b. "racially discriminatory selection and testing procedures"

As pointed out in Section IV(A)(2), *supra*, the regular Board of Examiners teaching hiring mechanism has been the subject of continuing criticism—both by the Board itself and by "outsiders"—on pedagogical and on legal grounds. OCR's investigation culminated in yet another allegation of discrimination resulting from the testing procedures. Specifically, OCR alleged that "three distinct but related aspects" of the regular hiring method had an adverse (disproportionate) impact on minority teacher

applicants: (1) the use of pass-fail scores on particular examinations; (2) the rank ordering by numerical score above the passing grade; and (3) the requirement that earlier eligibility lists be exhausted before later lists could be reached (the "date of examination" criteria). The agreement contains remedial measures directly addressed to these perceived impacts. *See* Def.Govt.Ex. 100 at ¶ 4(a), (b), (c), (d), (e) (validation, merger of lists, abolition of rank ordering, affirmative action); ¶ 5 (Board will seek remedial legislation and if not successful, will proceed to appropriate litigation); ¶ 6 (labor pool study; action to adjust percentage of minority teachers to reflect percentage of minorities in labor pool).

1. "pass-fail score achieved on a particular examination"

OCR recognized that use of a "pass-fail" examination score criterion as the basis for employment decisions is, itself, racially neutral. But in examining data on the pass-fail criterion's impact on minority applicants, OCR concluded that it had a marked impact—particularly in those examinations under which a large number of teachers were hired—along racial lines. Table 5 presents data on the pass rates of blacks and whites on several "large" examinations, and reports the results of tests for statistical significance.

Relevance of one particular statistical significance test—standard deviations—in determining the validity of a hypothesis that race played no role in a given decision was discussed by the Supreme Court in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 2742 n. 14, 53 L.Ed.2d 768 (1977) and *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). The Court indicated that " '[a]s a general rule for . . . large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations,' then the hypothesis that [persons] were hired without regard to race would be suspect." *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 2742 n. 14, 53 L.Ed.2d 768 (1977), *quoting Casteneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977).

In Table 5, the "Z statistic"— a standard test used to compare two proportions when the sample on which each of the proportions is based is large, here greater than 100, *see* Def.Govt.Ex. 45 at p. 23 (report by government's statistical experts)—represents the disparity in terms of standard deviations. *See, e. g.,* D. S. Lordahl, Modern Statistics for Behavioral Sciences 66 (1967). The "chi square statistic"—used to compare two proportions with a small sample size, *see id.* at 193—is as used in Table 5 representative of a disparity equivalent to the number of standard deviations squared (i. e., a chi-square value of "4" would indicate a disparity of "2" standard deviations). *See* Tr. at 1026–27 (testimony of Dr. Michaelson, government statistical expert). In more general terms, when the Table reports a result significant to the "5%" or ".05" level of significance, that is essentially the same as two standard deviations. *See* Def. Govt.Ex. 45 at pp. 4–5. Three standard deviations under these circumstances is roughly equivalent to statistical significance at the ".26%" or ".0026" level; thus, where results are reported as significant at the ".01%" or ".0001" level, they represent probabilities far higher than those accepted by the Court as indicating that the results obtained were not likely to be generated by a racially neutral system. *See id.* at 5.

TABLE 5: Racial Impact of Regular Licensing Exams on Pass Rates

| Name of Exam | Date of Exam | Number of Blacks Taking Exam | Percent of Blacks Who Passed | Number of Whites Taking Exam | Percent of Whites Who Passed | Test of Significance [a] | |
|---|---|---|---|---|---|---|---|
| | | | | | | Chi-Square | Z–Score |
| Early Childhood . . . . . . | 12–68 | 44 | 27.27 | 718 | 76.32 | 51.20 | |
| Early Childhood . . . . . . | 01–73 | 122 | 55.74 | 903 | 86.82 | | 6.71 |
| Early Childhood . . . . . . | 06–74 | 506 | 16.60 | 1,495 | 51.77 | | 16.76 |

| Name of Exam | Date of Exam | Number of Blacks Taking Exam | Percent of Blacks Who Passed | Number of Whites Taking Exam | Percent of Whites Who Passed | Test of Significance [a] | |
|---|---|---|---|---|---|---|---|
| | | | | | | Chi-Square | Z-Score |
| Common Branches .... | 12–68 | 24 | 20.83 | 555 | 44.14 | 5.10 | |
| Common Branches .... | 01–73 | 339 | 54.87 | 3,121 | 85.23 | | 10.94 |
| Common Branches .... | 06–74 | 953 | 28.54 | 4,491 | 65.80 | | 22.93 |
| Social Studies, JHS ............ | 12–68 | 12 | 8.33 | 245 | 43.27 | 5.75 | |
| Social Studies, JHS ............ | 02–74 | 175 | 20.00 | 965 | 50.98 | | 9.05 |
| Math, JHS [b] ........ | 11–72 | 19 | 31.58 | 158 | 65.82 | 8.46 | |
| Math, JHS ......... | 06–74 | 100 | 62.00 | 866 | 84.30 | | 4.45 |
| English, JHS ........ | 11–68 | 6 | 66.67 | 57 | 59.65 | 0.11 [c] | |
| English, JHS ........ | 06–74 | 89 | 47.19 | 612 | 57.84 | 3.59 | |
| Social Studies, DHS ............ | 03–68 | 10 | 0 | 379 | 42.22 | 7.18 | |
| Social Studies, DHS ............ | 06–74 | 156 | 7.69 | 1,153 | 33.91 | | 10.29 |
| Math, DHS ........ | 05–68 | 12 | 50.00 | 91 | 48.35 | 0.01 [c] | |
| Math, DHS ........ | 12–72 | 14 | 14.29 | 244 | 52.46 | 7.72 | |
| Math, DHS ........ | 05–74 | 40 | 25.00 | 494 | 49.19 | 8.69 | |
| English, DHS ...... | 04–68 | 7 | 42.86 | 182 | 50.55 | 0.16 [c] | |
| English, DHS ...... | 06–74 | 130 | 49.23 | 1,406 | 70.55 | | 4.69 |

[a] The Chi-Square with a Yates' Correction was used in most cases to measure the difference between the proportions because $N_B < 100$. Where $N_B < 100$ the Z-score was used with an unpooled variance.

[b] This refers to the Math JHS examination given during the 1972–73 school year. There is some confusion over the exact date.

[c] This difference is not significant at the .05 level.

SOURCE: OCR Data.

As Table 5 indicates, with three exceptions, the difference in passing rates between black and white applicants is statistically significant at at least the .05 level, and in many cases, at a much higher level. In other words, from a statistical point of view, the likelihood that the results observed would occur by chance (i. e., not explained by some other factor, such as race) was less (or much less) than five out of one hundred. In addition, the statistically significant disproportionate impact in so many test areas is grounds for added suspicion that a random neutral process was not at work. See Tr. at 1031–32 (testimony of Dr. Michaelson). See also Def.-Int. Ross' Ex. 106 (Gifford Report) at 33 ("[a]nalysis conducted by the Office of the Deputy Chancellor confirms that [the examinations] have a disparate impact on minority teacher applicants."); id. at 44 (pass-fail criterion has "an adverse impact on qualified minority candidates for teaching appointments").

2. "the numerical score above passing attained by the applicant on a particular examination"—the rank order procedure

As discussed previously in Section IV(A)(1)(a), supra, appointments under the regular hiring method are made in order of rank by numerical score on the eligibility list. In many cases, Board of Examiners rank order lists are based on scores carried out to three decimal places. See Def.-Int. Ross' Ex. 106 (Gifford Report) at 41. OCR's basic allegation with regard to this rank ordering is that it has a disparate impact on minority applicants who pass the examinations, because those applicants

were consistently overrepresented in low score categories and underrepresented in high score categories. This would affect hiring of black teachers, it is alleged, because those higher on the list are hired first under the rank order method (and also, presumably, may under the procedure following decentralization be requested first by the districts and may also have a first option for jobs in the more desirable districts). In addition, placement on the eligible list has significance in terms of seniority calculation, particularly with regard to transfer rights and order of excessing and layoff. *See* Plt.-Int. UFT Ex. 102, Art. 18, § 9 at p. 67 (transfer); Art. 17, §§ B(4), D at pp. 61, 64 (excessing and layoff).

HEW and the government's statistical experts caution that what is to be examined here are not the results in any given score category—since clearly, if blacks are underrepresented in given categories on an exam, they will be overrepresented on others—but rather the pattern of over- and underrepresentation. *See* Tr. at 1038 (testimony of Dr. Michaelson); Def.Govt.Ex. 45 at 41 ("The pattern of results is what is important. It is this pattern that indicates that

blacks are over-represented in the low score categories and under-represented in the high categories. This pattern is consistent from one year to the next and among the various examinations.").

In addition, criticism of the soundness of rank order by score was contained in the Gifford Report:

> [E]xperts in the field of psychometric testing have repeatedly warned that decision-making should not be based on such fine and potentially inaccurate distinctions. . . . [W]e can find no cogent defense or justification for using finely ranked scores above passing as a criterion in the teacher selection process.

Def.-Int. Ross' Ex. 106 at 40–41. *See also* Section IV(A)(2), *supra* (similar criticism by New York City Commission on Human Rights and by other authorities); Def.-Int. Ross' Exs. 121, 123 (affidavits of Prof. Trachtenberg) (same).

Tables 6 and 7 depict graphically some of the data presented showing that blacks who passed the examinations ranked at the lower end of the scale to a statistically significant degree. *See also* Def.Govt.Ex. 45 at 40–55 (additional data and analysis).

Table 6: Over- and Under- Representation of Blacks on Early Childhood Examinations, by Five Point Intervals

Differences in Percentage Representation

DIFFERENCE BETWEEN THE PERCENTAGE OF WHITES AND BLACKS IN EACH SCORE GROUP

## The Significance of the Difference
NUMBER OF STANDARD DEVIATIONS FROM THE EXPECTED VALUE

LEGEND:
TEST TAKEN — 12-1968, 1-1973, 6-1974

Table 7: Over- and Under- Representation
of Blacks on Common Branches Exam-
ination, by Five Point Intervals

## Differences in Percentage Representation
DIFFERENCE BETWEEN THE PERCENTAGE OF WHITES AND BLACKS IN EACH SCORE GROUP

## The Significance of the Difference
### NUMBER OF STANDARD DEVIATIONS FROM THE EXPECTED VALUE

| | 60—65 PTS | 65—70 PTS | 70—75 PTS | 75—80 PTS | 80—85 PTS | 85+ PTS |
|---|---|---|---|---|---|---|
| OVER REPRESENTED | 4.6 7.7 / 1.1 | .7 / 7.6 | 1.0 | | | |
| UNDER REPRESENTED | | -.1 | -.7 / -1.2 | -.4 / -2.0 -2.0 | -1.0 / -1.9 / -4.6 | -.7 -.4 / -3.7 |

LEGEND:
TEST TAKEN    12—1968    1—1973    6—1974

FPI—SST—6-27-77

3. "the date the examination is given"

As indicated in Section IV(A)(1)(a), *supra*, in making appointments under the rank order method, the Board must, under New York law, fully exhaust an eligibility list from an earlier date before utilizing a list from a later date. Thus, for example, a person ranking last on a list from a 1972 exam must be offered a position before a person ranking first on a 1973 list. The only exception to this rule under the regular hiring method (except for the special legislation with regard to substitutes appearing on eligibility lists, *see* Section (A)(3)(c)(1)), *supra*, was when the older list had expired; during the 1970's, however, the legislature—despite stiff opposition from the Board—has periodically extended the statutory life of many eligibility lists. *See* Tr. at 1535–36 (testimony of Ms. DeCanio, Deputy Director of Personnel) ("The Board has always been of the opinion that a teacher should not remain on the list longer than the statutory lifetime and they also

felt [the legislation] might have a detrimental effect against minorities."). OCR's basic allegation with regard to the date of examination criterion is that it has a disparate impact on minority eligibles, because they have in more recent years passed the examinations both at a higher percentage and in greater numbers. *See* Def.Govt.Ex. 49 (App. F). This effect, OCR argues, cannot be justified by any *bona fide* educational hiring necessity or criteria.

Statistical analysis presented by the government's experts, *see* Def.Govt.Ex. 45 at 26–40, confirmed that the date of examination criterion does have an adverse impact on black eligibles, although OCR's conclusions were somewhat refined. The "Z scores" demonstrate that, for the early childhood, common branches, social studies JHS and social studies HS exams, the increase in percentage of blacks passing over the years was statistically significant. The increase for the other examination levels was not significant; i. e., for these exams,

the probability of a person arbitrarily selected from the list being black was substantially the same over the years. Aggregating the statistics, a "Z score" of 2.61 (or greater than two standard deviations) was obtained; thus, overall, the proportion of blacks passing increases in later years. *See id.* at 27 (chart); 26–27 (explanation). Interestingly, statistical analysis concluded that these increases in proportion of blacks passing were not due to a significant increase in the black passing rate; rather, they were due to the fact that a greater number of blacks have taken the examinations in recent years. *See id.* at 30 (explanation); 31–32 (charts).

Of course, the fact that blacks appear with greater frequency on lists of more recent vintage in certain examination categories is only part of the story: only if these more recent lists are reached at a later date (or not at all), or if they can be expected in the future to be reached at a later date, will those appearing on more recent lists be subject to disadvantage in terms of actual opportunity for employment. In other words, if all outstanding eligible lists in a given area are exhausted rapidly—whether due to great demand for teachers in that category, or large numbers of appointment declinations by those on earlier lists—the date of examination criterion will have a substantially lessened impact. It is the case, however, that for certain purposes even a day's difference in date of appointment may have critical consequences for an individual teacher. *See* Section IV(B)(1)(b)(2), *supra* (effect with regard to seniority, excessing, layoffs, transfer rights).

The data on this issue is, in many respects, confusing and incomplete. *See* Def. Govt.Ex. 45 at pp. 33–35. Nonetheless, the government's statistical experts concluded that at least in some license areas, there have been long waiting periods between the time of list promulgation and the time a list is reached for appointments. *See id.* at p. 36 (elementary schools); p. 37 (junior high schools); p. 38 (academic high schools); p. 39 (vocational high schools). Moreover, there was testimony at trial that while during the period of the 1960's there was a critical teacher shortage and almost all lists were reached when promulgated, the 1970's have witnessed the reverse phenomenon: from 1972–1975, for example, there was a large reduction in appointments under the common branches–early childhood categories—those categories, importantly, showing significant increase in blacks as a proportion of those passing in recent years—with most appointments to elementary schools in these categories apparently being made under the alternate method. *See* Def.Bd.Ex. 1 at 7; Tr. at 1511–13 (testimony of Ms. DeCanio). Many vacancies during this period were filled by excessing and shifting of personnel from districts with too many teachers to districts with vacancies. *See* Tr. at 1513. Thus, at least in these categories, there was a pile-up of eligibles on lists and long waiting time for appointments; as already noted, it was during this period that the legislature extended the statutory life of many older eligible lists to enable those waiting on those lists to be eligible for appointment. Moreover, following the massive excessing and layoffs in 1975 and 1976, those teachers laid-off had priority for reappointment (since on preferred lists) over eligibles on any existing regular lists; when many vacancies became available starting in 1977, after exhausting preferred lists, the Board then was able to begin offering appointments to those on eligible lists. Testimony indicates that it first had to exhaust the common branches–early childhood lists whose life had been extended by the legislature, and only then could it move on to newer lists. For 1977, the Board reached through the January 1974 lists only to a score of 77, *see* Def.Bd.Ex. 1 at 8; for 1978, after reaching laid-off teachers, the Board only reached a special 1978 eligibility list composed of persons who, under special legislation, had appeared on expired 1971 and 1972 lists and were permitted to take closed examinations. *See id.*

Thus, at least during the period 1972 to the present, it would appear that there have been, with regard to elementary school lists, long waiting periods for appointment, particularly for those on the more recent eligibility lists.

Sharp criticism of the date of list criterion is found in the Gifford Report. Without purporting to reach any legal conclusion, especially given the pending *Rubinos* litigation, *see* Section IV(A)(2), *supra*, the Report concluded that, in addition to the criticisms already noted, less affluent potential teachers were particularly adversely affected by the waiting time required to exhaust prior lists:

> In addition to having a racially disparate impact, the use of date as a criterion . . penalizes potential applicants who are economically disadvantaged. (Data cited showing that large percentage of students in City University are of low income backgrounds, and that a major source of applications for New York City teaching positions is City University graduates.) Once they do finish college, those eager and qualified to enter the teaching profession are further delayed in doing so since they must take their place at the "end of the line."

Def.-Int. Ross' Ex. 106 at 37–40.

2. OCR's allegation that the Board has "assigned teachers . . . in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools"

The most controversial—and vigorously attacked—provisions of the agreement are those which require that the racial composition of the teaching staff in the system's schools and districts reflect, within five percentage points, the racial composition of the system's teaching staff as a whole. *See* Agreement, ¶¶ 1, 2. These provisions are independent of those involving remediation of any perceived discrimination in the system's hiring practices; they relate to the manner in which the system has assigned its teachers to schools and districts. Of course—as the dichotomy between the regular and alternate hiring system vividly indicates—"hiring" practices may, in some circumstances, be distinctly related to assignment practices; the alternate hiring method, for example, permits initial assignment only to a certain category of schools. As yet another example, where vacancies requiring assignment are in specific license areas, the impact of the method of hiring (or declaring eligible) persons in those license areas will be substantial on the nature of the persons available to fill those particular vacancies.

OCR's allegations in the assignment realm relate to two alleged phenomena: first, that examination of the racial character of the faculties at schools and in districts across the system reveals that teachers are not assigned randomly, but rather are concentrated by race; and second, that this racial concentration correlates highly with the racial composition of the school's student population—in other words, where there are large proportions of black students, there are relatively large proportions of black faculty; where there are lower proportions of black students, there are lower proportions of black faculty.

It is important to note at the outset what is no longer at issue in this litigation. OCR's original allegations included a charge that the Board had "assigned . . . assistant principals and principals in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools." Def.Govt.Ex. 49 at 1, 7–8, App. K. The assignment remediation provisions of the agreement, however, refer only to teachers. *See* Agreement, ¶¶ 1, 2. During the trial, the Court was informed that, as to the assignment issue, the Board and OCR concurred that the agreement did not resolve OCR's allegations as to supervisors, and that this would be the subject of further negotiation. *See* Tr. at 947–60. Thus, this Court will not address the assignment issue as it relates to supervisors, because that issue is not before it.

The data indicates a marked concentration of minority teachers in schools with the

highest populations of minority students. Table 8, presenting illustrative data for the 1974–75 school year, shows the distribution for all schools. *See* Def.-Int. Ross' Ex. 106 at p. 76 (chart); *see also Caulfield v. Board of Education of the City of New York*, 449 F.Supp. 1203, 1214 (E.D.N.Y.1978) (additional data). At this time, the systemwide percentage of minority teachers was approximately 11.7%.

TABLE 8: Distribution of Teacher Population by Minority and Non-Minority Group Membership and Degree of School Integration; All Schools, 1974–75

| PERCENT MINORITY PUPILS PER SCHOOL | SCHOOLS | | TOTAL TEACHERS | | NON–MINORITY TEACHERS | | MINORITY TEACHERS | |
|---|---|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 0 – 9.9 | 57 | 6.5 | 2,451 | 4.4 | 2,420 | 4.9 | 31 | 0.5 |
| 10 – 24.9 | 106 | 12.0 | 5,195 | 9.3 | 5,100 | 10.3 | 95 | 1.4 |
| 25.– 49.9 | 165 | 18.8 | 11,245 | 20.1 | 10,859 | 21.9 | 386 | 5.9 |
| 50 – 74.9 | 100 | 11.4 | 7,224 | 12.9 | 6,682 | 13.5 | 542 | 8.3 |
| 75 – 89.9 | 77 | 8.8 | 5,169 | 9.2 | 4,625 | 9.3 | 544 | 8.3 |
| 90 + | 375 | 42.5 | 24,782 | 44.1 | 19,824 | 40.1 | 4,958 | 75.6 |
| TOTAL | 880 | 100.0 | 56,066 | 100.0 | 49,510 | 100.0 | 6,556 | 100.0 |

Tables (not printed in this memorandum) summarizing the distribution of minority teachers in elementary, junior high, high and all schools for 1975–76 demonstrate a marked skewing of minority teacher population towards schools with higher minority student population. *See* Def.Govt.Ex. 49, App. K(1)–(4) (source of data); *see also Board of Education v. Califano*, 584 F.2d 576, 583 & n. 25 (2d Cir. 1978) (70% of minority high school teachers assigned to high schools where minority enrollment exceeds 70%, even though those high schools employed only 48% of the system's high school teachers; in high schools with below 40% minority student enrollment, in no case did minority teacher population exceed 3.7%; in high schools with above 90% minority student enrollment, in no case did minority teacher population fall below 16%, and in most cases it far exceeded that percentage); *id.* at 583–84 & nn. 26, 27 (districts with minority student enrollments above 90% had the highest percentage of minority faculty by a substantial margin; districts with minority student enrollment under 50% had a disproportionately low percentage of minority teachers); Def.-Int. Ross' Ex. 106 (Gifford Report) at pp. 75–79 ("Again and again, the same conclusion is reaffirmed: there is a high degree of teacher racial/ethnic concentration that matches (is highly correlated with) the pupil racial/ethnic concentration. . . . Separately analyzing [elementary, junior high and high schools] further confirms the same conclusion . . .. The message from the data is overwhelmingly clear.").

To determine whether this skewed distribution could have occurred under a random process—i. e., under a process of assignment under which each teacher, regardless of race, has the same chance of securing a given position—the government's statistical experts, using a Poisson distribution (assuming a model of schools of equal size), *see* Def.Govt.Ex. 45 at pp. 93, 98 & App. 1, obtained a picture of what the distribution of minority teachers would look like if a random process had been followed. They tested their model in various ways and determined that the results would be essentially the same if actual school sizes had been taken into account. *See* Def.Govt.Ex. 45 at pp. 127–29. It was then possible to compare this "expected" picture—which allows for the fact that the actual percentage of minority teachers in the system is low, and for the fact that, even under a random process, some schools might have a very low or very high percentage of minority teachers, *see id.* at 83–84—with the observed pattern, and determine the statistical significance of the disparity (whether the observed distribution could have occurred by chance).

Table 9 graphically depicts the comparison between the "expected" (random) and "observed" (actual) distribution of black teachers for the 1976–77 school year for elementary schools. The disparities appear marked, as well, for all other classes of schools except vocational high schools. *See* Def.Govt.Ex. 45 at pp. 100–103 (data on other schools). Table 10—which will also be used below in considering the correlation between distribution of black teachers and race of students—presents for each year across the "$X^2$" column the measure of significance of the disparities (chi-square). The chi-square values shown are large: in all levels and years the differences between the observed and expected distribution is significant at the .0001 or .01% level. This level of significance represents probabilities that by a vast margin satisfy the Supreme Court's standard of two or three standard deviations as establishing a legally cognizable likelihood that a system did not operate in a racially neutral fashion. Structurally, the data and statistics reported for each year are not independent, for of course all teachers are not reassigned every year. It is the cumulative picture that is important. *See* Def.Govt.Ex. 45 at p. 90.

Table 9 : Actual and Expected Racial Distribution of Teachers, Elementary Schools, 1976–77

Percentage of Black Teachers

TABLE 10: Tests of Non-Randomness in the Assignment of Black Teachers

(Spearman (S), Kendall (K) and Chi Square ($X^2$) Tests)

| School Year | Test | Elementary | Junior High/ Intermediate | High School |
|---|---|---|---|---|
| 72/73 | S | .74 | .78 | .63 |
| | | (.0001) | (.0001) | (.0001) |
| | K | | .54 | .45 |
| | | (.0001) | (.0001) | (.0001) |
| | $X^2$ | 3,494.47 | 23,203.10 | 742.60 |

| School Year | Test | Elementary | Junior High/ Intermediate | High School |
|---|---|---|---|---|
| 73/74 | S | .65 (.0001) | .60 (.0001) | .65 (.0001) |
| | K | | .45 (.0001) | .47 (.0001) |
| | $X^2$ | 4,510.93 | 17,355.53 | 721.07 |
| 74/75 | S | .69 (.0001) | .72 (.0001) | .61 (.0001) |
| | K | | .52 (.0001) | .43 (.0001) |
| | $X^2$ | 4,349.43 | 13,144.37 | 525.01 |
| 75/76 | S | .69 (.0001) | .66 (.0001) | .60 (.0001) |
| | K | | .49 (.0001) | .43 (.0001) |
| | $X^2$ | 2,723.09 | 7,042.41 | 336.10 |
| 76/77 | S | .70 (.0001) | .67 (.0001) | .60 (.0001) |
| | K | | .48 (.0001) | .44 (.0001) |
| | $X^2$ | 1,645.54 | 3,335.92 | 157.37 |
| 78/79 | S | .72 (.0001) | .70 (.0001) | |
| | K | .53 (.0001) | .51 (.0001) | |
| | $X^2$ | 1,729.10 | 11,968.36 | |

Note: For $X^2_{.01,9} = 21.666$; For $X^2_{.05,9} = 16.919$

Table 10 also presents results of statistical tests of the correlation between race of teachers and race of students in schools to which teachers are assigned. Because it was clear that the distribution of students by race was not random (due to such factors as housing patterns), normal correlation formulae could not be used. *See* Def. Govt.Ex. 45 at p. 106. What was used were two types of "rank" correlations—Spearman and Kendall. Schools were ranked by race of teacher and by race of student population and rank correlations performed. The results are given in the "S" and "K" columns. Again, across the board, they indicate a correlation between black teachers and black students significant at the .0001 level for all school years and at all school levels.

Because some observers of the New York City school system have maintained that the marked disparity in assignment of black teachers and the skewing of their assignment to heavily minority schools can largely be explained by the alternate hiring system —which, OCR alleged, did funnel greater percentages of black teachers to certain schools, *see* Section IV(B)(1)(a), *supra,* the government's statistical experts attempted to examine the effect of that system on the distribution of teachers. Table 11 presents their results. Elementary and junior high schools were broken down into two groups—45% and non-45% schools—and chi-square and rank correlations (as in Table 10) were performed within each group. As the Table shows, even where those schools using the alternate method and those not

eligible to use it are considered separately, the prior finding of non-random distribution of minority teachers, and of strong correlation between race of teachers and race of students, is significant for all schools and for all years at the .0001 (.01%) level. Thus, the government's statistical experts concluded that these findings "are not explained by the differential racial impact in hiring . . . between the [alternate] and regular systems." Def. Govt.Ex. 45 at pp. 108–113.

TABLE 11: Tests of Non-Randomness in the Assignment of Black Teachers
(Spearman (S), Kendall (K) and Chi Square ($\bar{X}^2$) Tests)

| School Year | Test | Elementary | | | Junior High/Intermediate | | |
|---|---|---|---|---|---|---|---|
| | | All | 45% | Non-45% | All | 45% | Non-45% |
| 72/73 | S | .74 (.0001) | .70 (.0001) | .63 (.0001) | .73 (.0001) | .69 (.0001) | .64 (.0001) |
| | K | | | | .54 (.0001) | .49 (.0000) | .47 (.0001) |
| | $X^2$ | 3,494.47 | 498.48 | 1,623.52 | 23,203.10 | 2,186.72 | 1,112.04 |
| 73/74 | S | .65 (.0001) | .58 (.0001) | .54 (.0001) | .60 (.0001) | .54 (.0001) | .45 (.0001) |
| | K | | | | .45 (.0001) | .40 (.0000) | .32 (.0000) |
| | $X^2$ | 4,510.93 | 487.67 | 1,370.32 | 17,355.53 | 3,933.81 | 1,031.99 |
| 74/75 | S | .69 (.0001) | .64 (.0001) | .57 (.0001) | .72 (.0001) | .63 (.0001) | .65 (.0001) |
| | K | | | | .52 (.0001) | .44 (.0001) | .49 (.0001) |
| | $X^2$ | 4,349.43 | 4,000.63 | 1,047.09 | 13,144.37 | 8,030.09 | 2,599.05 |
| 75/76 | S | .69 (.0001) | .61 (.0001) | .61 (.0001) | .66 (.0001) | .66 (.0001) | .56 (.0001) |
| | K | | | | .49 (.0001) | .49 (.0001) | .41 (.0000) |
| | $X^2$ | 2,723.09 | 1,522.79 | 998.61 | 7,042.41 | 5,345.04 | 978.58 |
| 76/77 | S | .70 (.0001) | .63 (.0001) | .61 (.0001) | .67 (.0001) | .60 (.0001) | .59 (.0001) |
| | K | | | | .48 (.0001) | .43 (.0000) | .43 (.0001) |
| | $X^2$ | 1,645.54 | 705.00 | 555.37 | 3,335.92 | 1,555.06 | 595.38 |

Note: For $X^2_{.01,9} = 21.666$; For $X^2_{.05,9} = 16.919$

The Gifford Report, see Def.-Int. Ross' Ex. 106 at pp. 77–79, reached a similar conclusion. It compared the distribution of teachers by race-ethnicity among schools according to their minority student concentration prior to the decentralization law with similar figures for the 1974–75 school year. The Report concluded:

Even before decentralization, minority teachers were heavily concentrated in schools with the highest proportions of minority pupils, although the concentration has dropped ever so slightly . . . However, in those schools where the minority pupil population is less than 50% . . . the concentration of non-minority ("white") teachers has actually increased . . . .

The analysis of data . . . does not support the assertion made by some commentators that the 1969 Decentralization Law "caused" the pattern of teacher ra-

cial/ethnic concentration alleged by OCR. In 1969–70, the year just before decentralization, schools with the highest proportion of minority pupils also had disproportionately more minority teachers. Five years later, the situation remained essentially unchanged.

*Id.* at 79.

Another assertion commonly made in explanation of the disparate pattern of teacher assignment and its correlation with race of students is that the subject-area variegated licensing system has contributed largely to the results. For example, disparate assignment might be caused where many vacancies occur in areas where there are simply not a large number of blacks eligible in the given subject license area. This argument, of course, has little relevance to the elementary school context, where all licensing falls in two areas—early childhood and common branches. Without detailing the efforts made by the statisticians to test this hypothesis, *see* Def. Govt.Ex. 45 at pp. 115–122 & App. 2, it is enough to say that they were able to "judge it unlikely that licensing variation by race of teacher can explain the racial distribution of teachers among schools," *id.* at 121–22.

3. OCR's allegation that the Board has "assigned teachers with less experience, lower average salaries and fewer advanced degrees to schools which have higher percentages of minority students"

While this allegation of assignment of less experienced, lower salaried and fewer graduate degree teachers disproportionately to minority schools was contained in the original allegation letter from OCR to the Board, no provision of the memorandum is directly designed to remedy any perceived problem in this area. Of course, to the extent that teachers reassigned in order to meet the goals set forth in the agreement, ¶¶ 1 and 2, will possess higher amounts of these variables and go to minority schools, or to the extent that teachers with lower amounts of these variables go to non-minority schools, the agreement may result in

some remediation. The primary purpose of setting out some of the data with regard to this allegation, however, is twofold. First, to the extent the allegation is reasonably supported by the evidence, it would lend support to the theory underlying OCR's asserted basis for Title VI jurisdiction—that the Board's teacher employment practices had a discriminatory effect on the students—at least to the extent that teachers with lower salaries, less experience and fewer degrees may be viewed as "less qualified" teachers. *Cf.* Section III(B), *supra* (jurisdiction). Second, as the discussion at Section IV(A)(2), *supra,* demonstrates, allegations of this kind have been made (and often by Board studies) over the years; thus, to the extent problems of this kind still exist, they form a relevant backdrop to consideration of the reasonableness of the Board's actions in entering into the agreement, and of the remedial measures themselves.

In analyzing the data, the government statistical experts utilized the criterion of teacher salary. This is because under the system's salary scale, teachers are "rewarded" with increased salary increments based both on years of experience and advanced educational degrees. The statisticians made no assumptions about the relationship of higher salary, more experience and degrees on the one hand, and teacher quality on the other; nor do we since testimony at trial indicated that teacher quality may peak after several years and drop thereafter. *See* Tr. at 258–61 (testimony of Dr. Michael Wachter).

The statisticians performed two types of comparisons. First, the "expected" and "actual" mean teacher salary per school were compared by a chi-square test; second, rank correlations were computed between mean teacher salary and percentage black students. The results are presented in Table 12. With the exception of vocational high schools and some few school levels for particular years, the distribution of teachers by salary is shown to be non-random to at least the .01 level of significance (and in many cases, to a higher

level). And in all cases except for vocational high schools, the non-randomness is significant to at least the .05 level of significance. In addition, the rank correlations show a negative correlation, significant to at least the .01 level (and in many cases, to a higher level), between percent of black students and mean teacher salary; that is, they show that the blacker the student body, the lower the average teacher salary. Again, the only real exception is for vocational high schools.

TABLE 12: Tests of Non-Randomness in the Assignment of Teachers by Salary
(Spearman (S), Kendall (K) and Chi Square ($X^2$) Tests)
[Source: Def. Govt. Ex. 45 at p. 131]

| School Year | Test | Elementary | Jr. High/ Intermed. | High School | | |
|---|---|---|---|---|---|---|
| | | | | All | Academic | Vocational |
| 72/73 | S | −.28 (.0001) | −.49 (.0001) | −.38 (.0002) | −.45 (.0001) | −.21 [a] (.3137) |
| | K | | −.34 (.0001) | −.24 (.0006) | −.29 (.0005) | −.17 [a] (.2246) |
| | $X^2$ | 102.47 | 74.05 | 34.15 | 45.39 | 4.08 [a] |
| 73/74 | S | −.27 (.0010) | −.47 (.0001) | −.33 (.0007) | −.33 (.0007) | −.32 [a] (.1207) |
| | K | | −.32 (.0001) | −.22 (.0008) | −.22 (.0008) | −.22 (.1289) |
| | $X^2$ | 10.61 [a] | 13.66 [a] | 28.63 | 28.42 | 5.61 [a] |
| 74/75 | S | −.22 (.0001) | −.43 (.0001) | −.34 (.0003) | −.38 (.0005) | −.27 [a] (.1971) |
| | K | | −.29 (.0000) | −.24 (.0003) | −.26 (.0006) | −.21 [a] (.1476) |
| | $X^2$ | 55.39 | 12.96 [a] | 349.10 | 440.04 | 14.37 [a] |
| 75/76 | S | −.23 (.0001) | −.40 (.0001) | −.32 (.0006) | −.38 (.0004) | −.13 [a] (.5544) |
| | K | | −.28 (.0000) | −.22 (.0010) | −.26 (.0006) | −.06 [a] (.6915) |
| | $X^2$ | 107.89 | 51.26 | 123.89 | 161.62 | 10.97 [a] |
| 76/77 | S | −.13 (.0011) | −.24 (.0014) | −.41 (.0001) | −.41 (.0001) | −.57 (.0038) |
| | K | | −.16 (.0019) | −.29 (.0000) | −.29 (.0001) | −.41 (.0038) |
| | $X^2$ | 101.90 | 48.33 | 144.98 | 171.99 | 7.82 [a] |

Note: For $X^2_{.01, 7} = 18.475$; For $X^2_{.05, 7} = 14.067$

[a] Not significant at 0.01 level.

When similar comparisons were performed within 45% schools and within non-45% schools at the elementary and junior high schools level, some differences emerged. Among non-45% schools (not eligible for the alternative hiring method) the distribution of teacher salary was again non-random in most cases to at least a .01 significance level, and there was again a strong negative correlation between black student population and average teacher salary (in most cases, significant at the .01 level). Among 45% schools (eligible for the alternate hiring method), however, the correlations are generally insignificant and show little stability over time. What this

shows is that within the 45% schools, teacher salary is generally distributed without regard to race of students. But because the 45% schools have a higher percentage of black students than non-45% schools, the significant comparison in this regard may well be not the distribution internal to those groups, but rather the comparison between those two groups. *See* Table 13, *infra.*

TABLE 13: Tests of Non-Randomness in Assignment of Teachers by Salary
(Spearman (S), Kendall (K) and Chi Square ($X^2$) Tests)

[Source: Def. Govt. Ex. 45 at p. 132]

| School Year | Test | Elementary | | | Junior High/Intermediate | | |
|---|---|---|---|---|---|---|---|
| | | All | 45% | Non-45% | All | 45% | Non-45% |
| 72/73 | S | −.28 (.0001) | −.08 [a] (.1899) | −.16 (.0035) | −.49 (.0001) | −.32 (.0095) | −.42 (.0001) |
| | K | | | | −.34 (.0001) | −.02 (.0091) | −.28 (.0001) |
| | $X^2$ | 102.47 | 28.29 | 33.00 | 74.05 | 175.75 | 21.65 |
| 73/74 | S | −.27 (.0010) | −.06 [a] (.3282) | −.13 [a] (.0149) | −.47 (.0001) | −.30 [a] (.0128) | −.36 (.0004) |
| | K | | | | −.32 (.0001) | −.19 [a] (.0179) | −.24 (.0006) |
| | $X^2$ | 10.61 [a] | 6.86 [a] | 9.09 [a] | 13.66 [a] | 20.99 | 21.34 |
| 74/75 | S | −.22 (.0001) | −.01 [a] (.8437) | −.16 (.0021) | −.43 (.0001) | −.21 [a] (.0713) | −.40 (.0001) |
| | K | | | | −.29 (.0000) | −.14 [a] (.0882) | −.28 (.0001) |
| | $X^2$ | 55.39 | 5.94 [a] | 67.61 | 12.96 [a] | 6.07 [a] | 7.83 [a] |
| 75/76 | S | −.23 (.0001) | .03 [a] (.6188) | −.20 (.0001) | −.40 (.0001) | −.35 (.0032) | −.31 (.0014) |
| | K | | | | −.28 (.0000) | −.23 (.0041) | −.21 (.0014) |
| | $X^2$ | 107.89 | 97.27 | 75.96 | 51.26 | 4.44 [a] | 36.54 |
| 76/77 | S | −.13 (.0011) | −.24 (.0001) | −.12 [a] (.0263) | −.24 (.0014) | −.14 [a] (.2223) | −.20 [a] (.0466) |
| | K | | | | −.16 (.0019) | −.09 [a] (.2578) | −.14 [a] (.0442) |
| | $X^2$ | 101.90 | 70.91 | 20.45 | 48.33 | 5.25 [a] | 171.17 |

Note: For $X^2_{.01,7} = 18.475$;  For $X^2_{.05,7} = 14.067$
[a] Not significant at 0.01 level.

A comparison of mean salaries between 45% and non-45% schools is shown in Table 14, utilizing the "Z score." The data shows that, in general, teachers in 45% schools are getting less salary than those in non-45% schools, with highly significant variation. The data would seem to indicate, however, that generally the variation has lessened in more recent years, although it is still highly significant.

TABLE 14: Mean Teacher Salary by Hiring System

[Source: Def. Govt. Ex. 45 at p. 134]

| Year | Elementary Schools | | | Junior High Schools | | |
|------|---------------|-------------------|---------|---------------|-------------------|---------|
| | 45-percentile | Non-45-percentile | Z Score | 45-percentile | Non-45-percentile | Z Score |
| **1972–73** | | | | | | |
| Mean | 12899.14 | 13929.67 | 13.23 | 12925.55 | 13755.57 | 5.25 |
| Standard Deviation | 875.48 | 1073.52 | | 903.77 | 1079.51 | |
| Number of Schools | 279 | 347 | | 64 | 95 | |
| **1973–74** | | | | | | |
| Mean | 14359.33 | 15484.44 | 12.89 | 14197.36 | 15130.19 | 7.53 |
| Standard Deviation | 1070.00 | 1126.31 | | 1087.17 | 1214.10 | |
| Number of Schools | 282 | 356 | | 70 | 96 | |
| **1974–75** | | | | | | |
| Mean | 15774.72 | 16512.11 | 6.39 | 15372.47 | 16352.62 | 5.08 |
| Standard Deviation | 1124.91 | 1788.52 | | 1257.32 | 1243.94 | |
| Number of Schools | 285 | 360 | | 73 | 99 | |
| **1975–76** | | | | | | |
| Mean | 17320.68 | 17950.37 | 8.94 | 16968.58 | 17664.81 | 4.30 |
| Standard Deviation | 846.59 | 917.96 | | 1036.90 | 1079.68 | |
| Number of Schools | 274 | 359 | | 71 | 105 | |
| **1976–77** | | | | | | |
| Mean | 18414.41 | 19009.44 | 8.64 | 18355.48 | 18732.27 | 2.67 |
| Standard Deviation | 894.00 | 792.49 | | 946.53 | 866.04 | |
| Number of Schools | 267 | 359 | | 71 | 102 | |

4. OCR's allegation that the Board has "denied [women] equal access to positions as principals and assistant principals throughout the system"

In its allegations letter, OCR asserted that while women comprised 60.1% of the system's teaching staff and 57.6% of those in other non-supervisory professional positions, only 23.3% of all school principals and 28.2% of all assistant principals were women. Further suspicion of possible sex discrimination was raised by the use of what OCR characterized as "vague and subjective employment criteria and procedures as an important part of the [supervisory] selection process." Possibility of discrimination was enhanced by the alleged "continuing failure of the . . . system to establish and enforce selection procedures which contain feasible safeguards . . . necessary to preclude considerations of sex from entering the selection process." Def. Govt.Ex. 49 at pp. 10–11.

OCR found a wide disparity between women teachers in the system it alleged possessed the specific qualification to become supervisors and the number of positions actually filled by women—they were allegedly underrepresented by a factor of 2–1. Id. at 11. Moreover, it found that the proportion of women supervisors (principals and assistant principals) had actually decreased in recent years. For these reasons, it concluded that, as to hiring of principals and assistant principals, the Board was in violation of Title IX.

The data used by OCR appears to show a marked statistically significant disparity between percentage of women teachers and women in supervisory positions, both across the system as a whole and adjusted for school level. See Def.Govt.Exs. 23, 24, 36, 37. Moreover, it shows that for the system as a whole, women now fill a significantly smaller proportion of the supervisory positions (at least as of 1976–77) than they did in 1971–72, despite the fact that the percentage of women in the teaching force has steadily declined. (The argument that this latter factor makes the former more significant is that if the percentage of women teachers in the system had expanded, one would expect a time lag before the assumedly comparable percentage of women would be supervisors since the increase in the teacher pool would be composed of women less experienced and hence not yet

qualified to serve as principals). *See* Def. Govt.Ex. 40.

The government recognizes, however, that a comparison between women teachers and women supervisors for purposes of determining whether women are underrepresented in the supervisory ranks is not strictly apposite, because the pool of persons eligible to be supervisors is, at least in part, a subset of all teachers—those with the requisite qualifications to be supervisors. It concluded that the minimum New York State requirement for supervisory certification is a bachelor's degree plus 30 hours of graduate study, and at least three year's experience in education, with at least 18 of the 30 hours of graduate study in the fields of administration or supervision. From the available data, the government also concluded that, historically in New York City, the overwhelming majority of supervisors have held a master's degree plus 30 hours of graduate study. *See* Def.Govt.Exs. 25A, 25B, 30. These conclusions led it to define a "qualified labor pool" for supervisory positions as teachers with a master's degree plus thirty hours of graduate study; the percent of women in this pool could then be compared with the actual proportion of women among supervisors to determine whether there was underrepresentation. Table 15 (Def.Govt.Ex. 26) presents the results of an across the system comparison; Table 16 (Def.Govt.Ex. 27) presents the results of a comparison by school level. For every year and school type, the statistics conclude that women are significantly underrepresented in supervisory positions.

TABLE 15: Women's representation among supervisors and in the pool of "qualified" potential supervisors [1]

| | 71–72 [2] | | 72–73 | | 73–74 | | 74–75 | | 75–76 | | 76–77 | |
| | Pool | Supv | Pool | Supv | Pool | Supv | Pool | Supv | Pool | Supv | Pool | Supv |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 14860 | 2656 | 14945 | 3080 | 16028 | 3163 | 17189 | 3193 | 18092 | 2860 | 21531 | 2674 |
| Women | 7449 | 820 | 7489 | 908 | 7926 | 885 | 8355 | 867 | 8759 | 766 | 10008 | 701 |
| % women | 50.1 | 30.9 | 50.1 | 29.5 | 49.4 | 28.0 | 48.6 | 27.2 | 48.4 | 26.8 | 46.5 | 26.2 |
| Z score p .01 | 19.53 | | 22.48 | | 24.11 | | 24.53 | | 23.83 | | 22.13 | |

[1] Teachers and other professionals with Master's degree plus 30 semester hours graduate study.
[2] Assistant principals were undercounted in the 1971–72 school year survey, but there is no reason to believe either sex was affected by the undercount more than the other.

Source: BEDS Teacher File

TABLE 16: Women Supervisors and "Qualified" Potential Supervisors by Type of School

| | Elementary | | Jr. High | | Vocational | | Academic HS | |
| | Pool | Supv. | Pool | Supv. | Pool | Supv. | Pool | Supv. |
|---|---|---|---|---|---|---|---|---|
| 1971–72 Total | 5264 | 1410 | 3565 | 852 | 725 | 87 | 5306 | 307 |
| Women | 3957 | 556 | 1238 | 175 | 280 | 12 | 1974 | 77 |
| % women | 75.2 | 39.4 | 34.7 | 20.5 | 38.6 | 13.8 | 37.2 | 25.1 |
| Difference | 35.8 | | 14.2 | | 24.8 | | 12.1 | |
| Z score | 24.97 | | 8.88 | | 20.79 [a] | | 4.73 | |
| 1972–73 Total | 5566 | 1366 | 3459 | 859 | 682 | 151 | 5238 | 704 |
| Women | 4068 | 535 | 1175 | 162 | 284 | 27 | 1962 | 184 |
| % women | 73.1 | 39.2 | 34.0 | 18.8 | 41.6 | 17.9 | 37.4 | 26.1 |
| Difference | 33.9 | | 15.2 | | 23.7 | | 11.3 | |
| Z score | 23.42 | | 9.69 | | 6.52 | | 6.34 | |

TABLE 16: Women Supervisors and "Qualified" Potential Supervisors by Type of School—(Cont'd)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **1973–74** Total | 5964 | 1351 | 3719 | 892 | 729 | 173 | 5616 | 747 |
| Women | 4277 | 504 | 1269 | 162 | 276 | 28 | 2104 | 191 |
| % women | 71.7 | 37.3 | 34.1 | 18.2 | 37.9 | 16.2 | 37.5 | 25.6 |
| Difference | 34.4 | | 15.9 | | 21.7 | | 11.9 | |
| Z score | 23.91 | | 10.59 | | 6.52 | | 6.91 | |
| **1974–75** Total | 6531 | 1371 | 4123 | 887 | 758 | 172 | 5777 | 763 |
| Women | 4594 | 510 | 1342 | 149 | 280 | 33 | 2139 | 175 |
| % women | 70.3 | 37.2 | 32.5 | 16.8 | 36.9 | 19.2 | 37.0 | 22.9 |
| Difference | 33.1 | | 15.7 | | 17.7 | | 14.1 | |
| Z score | 23.30 | | 10.85 | | 5.12 | | 8.54 | |
| **1975–76** Total | 6933 | 1199 | 4457 | 794 | 821 | 169 | 5881 | 698 |
| Women | 4833 | 435 | 1406 | 126 | 313 | 36 | 2207 | 169 |
| % women | 69.7 | 36.3 | 31.5 | 15.9 | 38.1 | 21.3 | 37.5 | 24.2 |
| Difference | 33.4 | | 15.6 | | 16.8 | | 13.3 | |
| Z score | 22.37 | | 10.65 | | 4.70 | | 7.65 | |
| **1976–77** Total | 8639 | 1143 | 5490 | 745 | 959 | 151 | 6443 | 635 |
| Women | 5663 | 412 | 1664 | 112 | 352 | 33 | 2329 | 144 |
| % women | 65.6 | 36.0 | 30.3 | 15.0 | 36.7 | 21.8 | 36.1 | 22.7 |
| Difference | 29.6 | | 15.3 | | 14.9 | | 13.4 | |
| Z score | 19.55 | | 10.54 | | 4.01 | | 7.63 | |

Source: BEDS Teacher File

[a] Chi square with Yates' correction

As a result of the agreement, the Board has begun to compile data on the sex of applicants for supervisory positions. There is, however, a serious problem with this data serving as the basis for any conclusion as to possible underrepresentation of women in the supervisory ranks: the data does not adjust for the fact that a given individual may apply for several—or many—supervisory vacancies. *See* Tr. at 1445–48 (testimony of Ronald Rudolf, Board administrative staff analyst). The data with regard to principals is presented in Table 17, Def.Govt.Ex. 34, and when compared with the data in Table 18, Def.Govt.Ex. 32, showing sex of newly hired principals, seems to indicate that women are not being hired at a lower rate than their percentage in the number of applications for principal positions. Information with respect to recent applications and hires for assistant principal positions is insufficient to draw any conclusions. To the extent that women and male applicants file multiple applications at roughly the same rate, of course, the defects in this data would be substantially compensated for, and the data would then indicate that following the agreement there has been some remediation of any prior bias. While it might be reasonable to conclude that both sexes made successive applications at the same rate, the record provides no basis for reliable conclusions on this point. *See* Tr. at 1447.

TABLE 17: Sex of Applicants for Principal Positions in Recent Years

|  | Elementary | Jr. High | Academic HS | Vocational HS | All Schools |
|---|---|---|---|---|---|
| 1976–77 Total | 4079 | 298 | 2400 | 1115 | 7892 |
| Female | 1065 | 48 | 262 | 102 | 1477 |
| % Female | 26.11 | 16.11 | 10.92 | 9.15 | 18.72 |
| 1977–78 Total | 8055 | 883 | 1609 | 526 | 11073 |
| Female | 2109 | 115 | 170 | 49 | 2443 |
| % Female | 26.18 | 13.02 | 10.56 | 9.32 | 22.06 |

TABLE 18: Sex of Newly Hired Principals in Recent Years
Sex of Newly Hired or Promoted Principals

|  | Elementary | | Jr. High | | Vocational HS | | Academic HS | | All Schools Combined | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1976–77 Total | 42 | – | 9 | – | 8 | – | 11 | – | 70 | – |
| Unknown | 0 | | 0 | | 0 | | 0 | | 0 | |
| Male | 27 | 64.28 | 1 | 11.11 | 5 | 62.50 | 11 | 100.00 | 44 | 62.86 |
| Female | 15 | 35.71 | 8 | 88.89 | 3 | 37.50 | 0 | | 26 | 37.14 |
| 1977–78 Total | 66 | | 17 | | 5 | | 11 | | 99 | – |
| Unknown | 0 | | 0 | | 0 | | 0 | | 0 | |
| Male | 43 | 65.15 | 13 | 76.47 | 4 | 80.00 | 10 | 90.91 | 70 | 70.71 |
| Female | 23 | 34.85 | 4 | 23.53 | 1 | 20.00 | 1 | 9.09 | 29 | 29.29 |

## C. Rebuttal Evidence

As 'pointed out above, see Section II, supra, the posture of this case has caused considerable confusion among the parties as to precisely what each "side" had to "prove" in order to prevail. In this court's judgment, it is not called upon here to decide whether the Board has actually violated Title VI, Title IX or the constitution. Nor need it decide whether any alleged violations were "intentional" or rather the "effect" of the complex interaction of New York State Education Law, Board policy, and the realities of administering a large and complex northern urban school system—including problems of teacher reluctance to work in "difficult to staff" schools, most often heavily minority in student population.

The rebuttal evidence in this case falls into two main categories: that offered, primarily by plaintiffs, to dispute some of the statistical findings and conclusions made by OCR and largely confirmed by the government's statistical experts; and that offered, primarily by the Board, to rebut any conclusions that intentional discrimination was practiced. With regard to the first category, this court concludes after careful consideration of all the evidence that the evidence offered in rebuttal by plaintiffs' experts does not appreciably undercut the reasonableness of the conclusion by OCR and the Board that the state of affairs existing in the New York City school system with regard to teacher hiring and assignment and supervisory hiring was drastically in need of remediation. In many respects, the evidence offered in rebuttal—while carefully prepared and illuminating on the nature of the problems facing the New York City School system—did not undermine either the specific allegations of impropriety contained in the OCR letter or, more importantly, the specific problems addressed by

the agreement. In no significant respect did this evidence serve to place in doubt the essential reasonableness of the remedial measures undertaken in the agreement in light of the problems identified by OCR and substantiated by the government's statistical evidence—problems, it must be reemphasized, which the Board itself has, for the most part, recognized and partially attempted to remedy in recent years.

With respect to the second category of rebuttal evidence, this court makes no finding as to whether or not the Board has engaged in "intentional" discrimination with respect to its teacher hiring and assignment or supervisory hiring practices. All it concludes is that, given the evidence, the Board could have reasonably believed itself in serious peril of facing such a finding had either the government, or a private party, initiated litigation challenging the practices which the agreement seeks to remedy. Given the evidence that the problems addressed by the agreement have existed, in varying degrees, since at least 1954; that the Board was aware over this time of many of these problems; that reports by its own staff and by outside experts had urged remedial efforts; that, in many respects, the remedial efforts undertaken could be viewed as grossly inadequate; and that—unlike the case with respect to pupil segregation in this city—the Board has had and continues to have ultimate authority over and the power to act with respect to teacher assignments, see e. g., In the Matter of Skipworth, 14 Misc.2d 325, 180 N.Y.S.2d 852, 871, 872 (Dom.Rel.Ct. 1958); Board of Education v. Califano, 584 F.2d 576, 582 (2d Cir. 1978), a strong case could be made for intentional discrimination on this record. This is not to suggest that a case could not be made out the other way. For, as discussed below, the Board offered substantial evidence of its good faith efforts to address the employment and assignment problems it faced, and of the fact that, in many respects, it may have been caught in a bind between the requirements of New York State Education Law on the one hand, and the realities of the school system—including changes in its demographic character, shortages of qualified teachers, attitudes of personnel, practices of local school districts and the like—on the other hand.

Under the first category of rebuttal evidence, plaintiffs' main witness was an expert labor economist. He sharply criticized OCR's conclusion that the regular hiring system resulted in a disparate impact on minority teacher applicants. In his view, proper consideration of this issue required examination of the number of qualified minorities in the relevant labor pool; only by comparing the proportion of minority teachers in the system to the proportion in the relevant labor pool could it be determined whether or not minorities were truly underrepresented in the system. After conducting such an analysis—although, he conceded, a limited one which did not, because of time pressures, examine all relevant factors, see Tr. at 368, 431–34, 446—he concluded that New York had employed a proportion of minority teachers consistent with their presence in the labor pool since 1969, that the percentage of minority teachers in the system had risen as their percentage in the pool had risen over the years, and that this increased representation could be expected to continue. See Tr. at 190–237; 343–78; Pl.-Int. UFT Exs. 109–111.

It was the court's impression that this analysis of the labor pool was too narrow in approach; had the Board been free to offer immediate employment to black and hispanic teachers who were qualified, it could have drawn minority teachers from a wide national pool to a much greater degree than it did. But whatever the validity of this limited labor pool analysis, it does not disparage either OCR's specific allegations with regard to the disparate effect of the Board of Examiners testing system itself, or the specific remedial measures of the agreement—which call for validation of any tests used for teacher hiring, and for attempts (through sponsoring of legislation or litigation) to abolish the rank order and date of examination hiring priority rules.

Even if an employment system viewed as a whole reflects hiring of minority appli-

cants in proportion to their presence in a theoretical geographically limited labor pool, that fact does not preclude challenge to specific hiring practices which, as alleged here, have a disparate impact on a certain class of applicants. *Cf. Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978) (dicta) ("a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear beyond cavil that the obligation imposed . . . is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force."); *Morgan v. Kerrigan*, 530 F.2d 431, 432–33 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), *aff'g Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974) (court did not err in setting goal for minority faculty hiring in excess of figure offered as representative of minority percentage in labor pool; setting goal at lower figure, which was comparable to actual current percentage of minorities in teaching force, would have nullified any remediation of employment discrimination court had previously found). Moreover, it may well be the case here that the improvement plaintiffs' expert found in terms of minority representation in the school system's teacher corps was due, at least in part, to the alternative hiring system. For the evidence shows both that a large number of appointments during the 1970's were made via that system, *see, e. g.*, Def.Bd.Ex. 1 at 7; Section iv(A)(3)(c)(1), *supra*, and that the alternative system probably resulted in appointment of a proportionately larger number of minority teachers. In addition, there was testimony that the Board of Examiners hiring mechanism caused the Board great difficulty in recruiting qualified minority teachers, particularly if they resided in other areas of the country. *See, e. g.*, Tr. at 510, 563 (testimony of Dr. Arricale, former personnel director of Board).

Under these circumstances, while a thorough labor pool analysis would doubtless have provided useful additional information on the effect of the Board's hiring practices overall, its absence cannot be said—in light of the strong evidence of disparate impact by operation of the regular hiring system and the remedial measures tailored closely to attempt to remedy that impact—to vitiate the reasonable conclusion that the regular hiring practices might subject the Board to liability, or the reasonableness of the remedial measures. In this regard, it should be noted that the agreement itself calls for a comprehensive labor pool study; if that study reveals that the system has not performed adequately across the board in hiring of minority teaching personnel, the Board commits itself to remedial action. This study may confirm plaintiffs' expert's conclusions; if it does, no further action may be necessary. If it does not, it is possible that the remedial action already contemplated with regard to the regular hiring system will have begun to erase any inequities. This court, of course, cannot rule on possible additional affirmative action measures which are not yet specified, much less put into operation.

Several plaintiffs' rebuttal and Board witnesses testified with regard to the distribution of educational resources among school districts and possible correlation with the racial character of the student body in those districts. Apparently, this testimony was intended to rebut any conclusion—arguably flowing from OCR's allegation that the Board's practices had resulted in assignment of less experienced, lower salaried and fewer degreed teachers to heavily minority schools—that the system was denying quality education to some of its students. One study, for example, examined the distribution by district of five educational "quality indicators": pupil-teacher ratio, average class size, percent teachers with five years or more experience, dollar expenditures by city, and state-federal dollar expenditures. It then correlated this distribution with the percentage of minority students per district. The conclusion was that while there were statistically significant differences in the distribution of these factors, the magnitude of the differences was minimal. *See*

Tr. at 237–57; Pl.-Int. UFT Ex. 113. *See also* Tr. at 1893–1907; Def.Bd.Ex. 35 (testimony and analysis of Dr. Paul Ritterband) (statistical analysis of distribution of quality indicators shows little distinction between minority and nonminority pupils, and is not explained by percentage of minority pupils); Tr. at 1755–62; Def.Bd.Ex. 46 (testimony of Ms. Newman and Board allocation formulae) (Board formulae for distribution of funds adjusts for variation in teacher salaries among districts and for relative educational needs of districts). These analyses tended to show that the Board was, to the best of its ability, attempting to provide a quality education throughout its system without regard to the racial characteristics of the student population, and that it may well be expending more funds overall on educationally more needy students, who are disproportionately minority. But, again, debate on this point and conclusions as to resource allocation have little to do with the agreement itself, since the agreement does not address nor attempt to remedy any perceived inequality in allocation of educational resources.

Under the second category of rebuttal evidence, considerable evidence was introduced by the Board—with the plaintiffs understandably riding piggyback—to rebut any inference that what the Board conceded was a state of affairs in need of remediation resulted from any acts of intentional discrimination on its part. Evidence was introduced to show, for example, that the Board has made consistent and good faith efforts over a number of years to recruit qualified minority teachers. *See* Tr. at 465–73, 482–83 (testimony of Dr. Frank Arricale, former director of Division of Personnel); Def.Bd.Ex. 1 at 10–11 (listing twenty steps taken); Tr. at 81–87 (testimony of Dr. Theodore Lang, former Board Deputy Superintendent of Personnel). Several witnesses testified that the Board of Examiners hiring system had impeded these efforts. *See* Tr. at 510, 536 (Dr. Arricale): *id.* at 123–24 (Dr. Lang). *See also* Tr. at 90–95, 104–05 (Dr. Lang); Pl.-Int. UFT Ex. 114 at pp. E–9—E–11 (effect of paraprofessional program devised by Board and UFT

in recruiting greater numbers of minority teachers). The Board also introduced evidence to show that it had made efforts—although often frustrated by factors such as high rate of teacher declination of appointments to difficult to staff schools—to assign regularly licensed teachers to problem schools, particularly at the elementary school level. *See* Section IV(A)(2), (3), *supra* (use of experience indices and appointment ratio procedures); Def.Bd.Ed. 1 (same). *See also* Tr. at 494–97 (Dr. Arricale) (efforts of Board and UFT to persuade teachers to accept appointments); Tr. at 141–50 (testimony of George Fesco); Tr. at 97–98 (Dr. Lang); Tr. at 1537–38 (Ms. DeCanio); Pl.-Int. UFT Ex. 102 (effect of UFT transfer plan in limiting exodus of experienced teachers from problem schools and encouraging transfers to those schools).

The Board also introduced evidence that it had supported and sponsored legislation (most often unsuccessfully) that would have drastically reformed the regular hiring method by virtually eliminating the Board of Examiners hiring process. In addition, it has consistently opposed (again, unsuccessfully) legislation which it viewed as exacerbating the undesirable effects of that system (such as that extending the life of eligible lists). On the other hand, it has consistently supported legislation which was viewed as facilitating regular appointment of minority teachers (such as that authorizing appointment of substitutes out of rank order, closed examinations for substitutes, and inclusion of paraprofessional service in calculating teacher seniority).

Finally, the Board introduced evidence regarding the complexity of hiring and assignment procedures; the historical problems it has faced in staffing schools—particularly heavily minority schools—with qualified teachers; and the lack of power it allegedly has, under New York law, to effect many reforms it has wanted to make. Def.Bd.Ex. 1; Tr. at 1489–1541 (testimony of Ms. DeCanio); *id.* at 464–501 (testimony of Dr. Arricale).

In only one substantive area does this court view the rebuttal evidence presented

as seriously placing in question the validity of the government's statistical analysis. With regard to the evidence as to possible underrepresentation of women in the system's supervisory corps, the Board introduced evidence which tended to put in doubt the government's definition of the subset of teachers who are in the qualified labor pool for ascension to supervisory positions. The government, *see* Section IV(B)(4), *supra,* has defined this pool as teachers with a master's degree plus thirty graduate hours. But the Board's evidence pointed out that under its employment system, all teachers are required within five years of initial hiring to obtain these educational levels. *See* Tr. at 1406–1411 (testimony of Gerald Brooks, Board Administrator of Field Services, Division of Personnel). Moreover, a teacher with such credentials is not automatically qualified to attain a supervisory position, for he or she must also have state certification, which requires at least 18 graduate hours in specialized administrative courses and, apparently, at least one year of supervisory internship experience. *See* Tr. at 1404.

Nonetheless, when the evidence is viewed in its totality, it supports the reasonableness of the provision of the agreement relating to problems of women's representation in the supervisory ranks. First, the agreement contemplates that the Board will initiate an affirmative action program to increase the number of women supervisors; the ultimate goal will be to have this participation reflect the percentage of woman in the qualified labor pool. In addition, the Board has agreed to establish a procedure to monitor supervisory selection processes to insure that women applicants are not being treated unfairly. *See* Agreement, ¶ 8.

Second, testimony by the Board's own witnesses revealed that whatever the problems with the available data, the Board has consistently perceived that supervisory hiring practices—both with regard to selections made by the Board for high school positions, and with regard to selections made by local districts for their schools— may have treated women unfairly. *See, e. g.,* Tr. at 1418 (in system's academic high schools, there is apparently only one woman principal); *id.* at 1361–62, 1379, 1421–22 (testimony of Mr. Brooks). To remedy the perceived problem, the Board—partially on its own, partially under the command of the *Chance* litigation (which found racial discrimination in supervisory selection procedures), and partially under the agreement— has instituted a procedure to monitor all supervisory selections to insure that all applicants are considered fairly. *See* Tr. at 1361–62, 1364–65 (testimony of Mr. Brooks). Under this process, the Board has observed serious problems with regard to selection practices in some local districts. While initially it attempted to remedy these problems by warning letters indicating that further appointments would not be approved until the selection processes had been reformed, the Board has now begun to reject particular appointments where it continues to find indicia of unfairness. *See* Tr. at 1361–62, 1383–84, 1390–96. Under this new procedure, the Board's witness testified that there has been improvement in the treatment of women applicants. *See* Tr. at 1423 (testimony of Mr. Brooks).

## V.

### Summary and Conclusions

This is not a case where the court is confronted with allegations of discrimination and must determine whether a school system has acted so as to violate particular statutes or the Constitution. Nor is it a case where the court must undertake the difficult task of devising a remedial regime to draw a school system into compliance with the commands of the law. The decisions at issue here have been made by appropriate educational authorities; the court's view of whether other action might have been more appropriate is irrelevant. The central issue is whether what has been characterized by the Second Circuit in *Caulfield* as a voluntary remedial agreement between the federal government and the

New York City school system impermissibly infringes on the statutory or constitutional rights of affected third parties.

Had the plaintiffs in this case and those they represent been afforded a real opportunity to participate in the discussions leading to promulgation of the agreement at issue, it is at least possible that much of the resulting controversy and confusion would have been avoided. At the very least, they would not then have had grounds to complain that the government and the Board had acted arbitrarily and without full consideration of all the relevant evidence; they might well have emerged from the process, if not entirely satisfied with its outcome, at least with a sense that the details of their position and problems had been considered by the governmental agencies involved.

The record supports the following findings of fact and law: (1) there was a reasonable belief on the part of the Board and OCR that the Board's hiring and assignment practices were in violation of Title VI, Title IX, and the Constitution; (2) the remedial measures embodied in the agreement represent a reasonable means for attempting to cure what the parties reasonably believed were inequities in the system; and (3) those measures do not violate the plaintiffs' statutory or constitutional rights. Addressing the contested portions of the agreement, these conclusions follow, whether the standard for establishing a violation of Title VI or Title IX is an "effects" standard, or the fourteenth amendment "intent" standard.

With regard to the Board of Examiners testing procedures covered by paragraph four of the agreement, the statistical evidence makes out a strong case for the proposition that the examinations had a disproportionate adverse impact on black teacher applicants; this—coupled with the fact that the evidence indicates that at least one viable alternative hiring method, the NTE process, was more successful in recruiting minority teachers—indicates the reasonableness of the requirement that the examinations at least be validated. Moreover,

the evidence makes out a strong case that both the "rank order" and "date of examination" hiring criteria have had a disproportionate adverse impact on black applicants. Coupled with the evidence tending to show that these criteria are either wholly unrelated or only tenuously related to teacher qualification, there is ample ground for the provisions of the agreement calling for attempts to abolish, either by remedial legislation or Board-initiated litigation, these incidents of the regular hiring process.

■ The remedial provisions of paragraph four of the agreement do not violate any person's statutory or constitutional rights. First, there is substantial historical evidence confirming that the Board of Examiners system has been perceived as unjustified for a long period of time. Second, long prior to the instant controversy, the Board itself has repeatedly attempted, albeit unsuccessfully, to accomplish the reforms it commits itself to attempt again under the agreement. Third, these reforms do not replace the current system, whatever its validity, with a system that will hire unqualified persons to the detriment of potentially qualified applicants. Rather, the goal is to insure that the hiring system will more accurately select qualified teaching personnel, to the benefit not only of all potential teachers, but also of the students in the school system. Fourth, no possible interests of teachers currently in the system—whether now employed, or entitled to some hiring preference by virtue of prior service—is impacted. And, finally, there is substantial evidence that, quite apart from the agreement, the Board would have been fully justified from the standpoint of both administrative and pedagogical concerns to seek the reforms the agreement seeks to implement.

With regard to paragraphs one and two of the agreement, requiring the Board in coming years to take certain action to insure that the teacher corps in each school and district reflects the racial composition of the system's teacher corps as a whole, the evidence was overwhelming that the

Board's practices (however mandated) had the effect of distributing teachers in a non-random manner with respect to race, and of assigning minority teachers to schools disproportionately populated by minority students. The evidence indicates that the system's teaching staff is segregated. This segregation tends to identify and reinforce the identity of the system's schools as intended for students of a particular race.

In view of this state of affairs, the remedial measures in paragraphs one and two cannot be viewed as unreasonable. First, the measures are designed to distribute teachers so as to eliminate marked teacher segregation; such action is designed not only to protect the rights of minority teachers, but also the rights of students in the school system, both black and white.

Second, the measures are flexible; paragraph three of the agreement indicates that the Board will be given latitude in any implementation of the remedial program where such latitude is required by "genuine requirements of a valid education program," and paragraphs one and two themselves contain "educationally-based program" exceptions. These flexibility provisions will permit the Board to retain ultimate and primary authority to exercise its pedagogic and administrative responsibilities to protect the rights of students and faculty and to provide sound education for all students.

Third, these measures as presently construed do not impact adversely in violation of any statute or the constitution on the rights of teachers now serving in the system, teachers who have previously served in the system and retain preference for rehiring, or potential teachers. Teachers are hired by the New York City school system to teach in that system; there is no evidence that they have any right—contractual or otherwise—to employment or assignment, at least initially, to a particular school or in a particular locale. Rather, the Board is entitled to deploy its teachers so as best to effectuate its educational program, and it must do so in compliance with federal law. If a newly hired teacher (or a teacher, previously employed, who becomes eligible for rehire) does not wish to teach where the Board directs him or her to teach, he or she may choose not to become an employee of the system. A teacher may not claim a right, however, to be assigned where he or she wishes to be assigned.

Fourth, implementation of these remedial measures has not been shown to impact on any seniority or other vested contractual rights of effected teachers. Should implementation of these measures as it evolves require what any teacher views as an infringement of any contractual or other rights, that teacher may challenge his or her assignment in an appropriate forum—whether through internal Board and union grievance procedures, in the state courts, or in the federal courts.

Fifth, the measures do not contemplate that the Board will assign unqualified teachers to its schools. To the extent that the remedial measures take race into account in assigning teachers, they do so to remedy what substantial evidence has shown to be a more than arguable violation of federal statutes and the Constitution.

▮ Finally, quite apart from the agreement at issue here, it is likely that the Board in its pedagogic judgment as to the best interests of the students under its aegis could on its own initiative take similar measures to attempt to integrate its teaching staff. It is with the Board that final judgment and authority rest in determining what measures best promote the interests of the school system. *Cf., e. g., Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d .554 (1971) ("School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of [black] to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary power of school authorities"); *Offermann v. Nitkowski*, 378 F.2d 22 (2d Cir. 1967) (uphold-

ing voluntary action by school board taking race into account to eliminate de facto pupil segregation).

Paragraph six of the agreement, which commits the Board to conduct a study of the percentage of qualified minorities in the labor pool and to make efforts (including those set forth in paragraph four of the agreement) to insure that minority participation in the teaching corps will reflect that percentage, does not impact on any rights of plaintiffs or potential teachers. First, the requirement specifically eschews characterization as a "quota". While this is not, of course, dispositive, the agreement specifically provides that failure to meet the goals set forth will not constitute a violation if the Board acts in good faith to recruit minority applicants under a non-discriminatory hiring mechanism. Second, the agreement embodies specific protection for teachers currently employed; it does "not require the Board to lay off any teacher currently employed" or to cancel any right of rehiring or seniority. Third, the agreement does not require the Board "to hire any teacher who has not met appropriate requirements for employment." This court cannot pass on any possible deleterious effects paragraph six of the agreement may have in the future; there was, in fact, no evidence of any such potential adverse effects. If, for example, the conclusion of further labor pool studies demonstrates that the Board in fact employs a percentage of minority teachers commensurate with representation in the qualified labor pool, presumably no additional remedial action would be required under the agreement. In the face of substantial evidence that a major component of the Board's hiring system had an adverse impact on minority applicants, and in view of the Board's own conclusions, both in this specific regard and to the effect that it has not done as well as it believed desirable in hiring minority teachers, this portion of the agreement cannot be characterized as unreasonable.

On similar grounds, and for the additional reasons discussion in Section IV(C), *supra*, the provisions of paragraph 8 of the agreement are not improper. The require-

ment that the Board establish a review procedure for supervisory selections to insure that there is no unfair treatment of women applicants, and to monitor the effectiveness of affirmative action efforts, does not violate any plaintiff's rights.

In short, the agreement is valid and does not violate any right of any plaintiff. The complaint is dismissed, without costs or disbursements.

So ordered.